**STATE of Missouri, Respondent,**

v.

**Eldon TINSLEY, Appellant.**

**No. 25870.**

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 16, 2004.

Nancy A. McKerrow, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Dora A. Fichter, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Eldon Tinsley ("Appellant") appeals his conviction after a jury trial for murder in the first degree, a violation of section 565.020.[1] The trial court sentenced Appellant to life imprisonment without the eligibility of probation or parole.

The sufficiency of the evidence is not an issue in this appeal. "We view the evidence in a light most favorable to the verdict." *State v. Johnson,* 95 S.W.3d 221, 222 (Mo.App.2003). The evidence adduced at trial reveals that on May 9, 2001, Myung Kyu Kim ("Kim") entered the American Bank in Baxter Springs, Kansas, and attempted to cash three checks that Appellant had given him in exchange for goods.[2] Upon presentment of the checks, Kim was told by the bank teller that Appellant's bank account had been closed for three years and that she could not honor the checks. Kim was advised by the Baxter Springs police department to contact the Joplin police department. Instead of contacting the Joplin Police Department, Kim decided to go to Appellant's home in Joplin and get either his money or his merchandise from Appellant.

By chance, Appellant's daughters, Cheena and Tonya, arrived at Appellant's home at around 10:00 a.m. that morning. Neither lived with Appellant. They found Kim waiting outside of Appellant's home for Appellant. Both Cheena and Tonya recognized Kim from his previous dealings with Appellant. Tonya knocked on Appellant's door and then called Appellant from Kim's cellular phone, but Appellant would not come to the door of his home. After waiting about ten minutes, Cheena and Tonya left.

Kim then called his girlfriend, Hyang Park ("Park"), in Texas and told her that he was at Appellant's house; that Appellant would not answer the door; and that he was going to wait for Appellant to come out.

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. Kim, a native of South Korea who resided in Irving, Texas, made his living by traveling through a tri-state area selling merchandise such as T-shirts, sunglasses, and watches to the public at wholesale prices. He often sold merchandise to Appellant, who would then re-sell the items at the Joplin flea market.

At around noon, Kim phoned Park again. This time Kim told Park that he was inside Appellant's house and he wanted Park to speak to Appellant about getting the money Appellant owed him. Park then spoke with Appellant and informed Appellant that he needed to deal with his bank; Appellant told her that he would. After Appellant gave the phone back to Kim, Park, who was "feeling sort of strange" about the situation, asked Kim for Appellant's phone number, which he gave her. When Park called Kim at Appellant's home five or ten minutes later, there was no answer.

At around 2:00 or 2:30 that afternoon, Tonya phoned Appellant from a friend's home to see if she had any phone messages waiting for her at Appellant's home. Immediately after they got off of the phone, Appellant called Tonya back at her friend's home. Sounding out of breath, Appellant told Tonya that he needed her to come to his home and that he wanted her to come alone.

When Tonya arrived at Appellant's home, "he told [her] that he ha[d] something really important to tell [her]. And that he was trusting [her] with his life. And that he had killed somebody." Appellant then told her that he had gotten into an argument with Kim and that he had killed him. Knowing that Appellant kept a 9–millimeter gun in his filing cabinet, Tonya asked Appellant if he shot Kim. Appellant responded by telling her that "it was none of [her] business." Tonya did not see Kim's body, but she did observe some blood in the laundry room once she arrived at Appellant's home.

Appellant asked Tonya to help him dispose of the contents of Kim's truck and asked her to meet him at Stowaway storage. On the way to the storage unit, Tonya stopped to see her friend Kim Clevenger ("Clevenger"). She told Clevenger that she would be back to pick her up later. Tonya informed Clevenger that her father had killed someone and she had to help him unload a truck.

At about 3:00 p.m., Appellant rented a storage unit at Stowaway storage and he and Tonya placed the contents of Kim's truck in the storage unit. Then they parked Kim's truck in the Wal–Mart parking lot and abandoned it there. While at Wal–Mart, Appellant and Tonya purchased a padlock for the storage unit.[3] Appellant and Tonya returned to the storage unit to place the lock on the door and then went back to Appellant's home at about 4:30 p.m.

Upon arrival at Appellant's home, Appellant told Tonya that he was going to Mike Hatten's ("Hatten") auction house to buy a metal drum and that he wanted her to come back to his house at 9:00 p.m.[4] Tonya then went to see Clevenger and later visited with Cheena. Tonya told both of them what had happened that day. According to Cheena, Tonya and her boyfriend, Tim Avey ("Avey"), arrived at her house at around 6:00 p.m.

At some point in the late afternoon, Clevenger went to the Joplin police department to report Kim's murder. Based upon Clevenger's information, the police placed Appellant's home under surveillance. Officer James Altic testified that Appellant arrived home in a maroon van. After parking the van, Appellant began

---

3. The Wal–Mart store surveillance tapes showed Tonya entering the store at 3:28 p.m. that day.

4. Hatten testified that Appellant purchased a large metal barrel from him at around 4:30 p.m. that day and loaded the barrel into the trunk of his Lincoln Towncar.

unloading its contents and carrying items into his home. After ten to fifteen trips into the home, Appellant emerged from the house with a metal drum on a dolly. Wearing latex gloves and struggling with the drum, Appellant wheeled the dolly to the carport and set it down by the maroon van. As Appellant entered the van, he was surrounded by the police. When the police removed the lid of the drum, they discovered Kim's body inside.

The record reveals that an autopsy showed that Kim died of a close range gunshot wound to the head. Through the use of luminal[5], the police detected the presence of blood in Appellant's dining room, kitchen, bedroom hallway, and bathroom sink; there was visible blood in the doorway between the kitchen and the bedroom. Police recovered a 9–millimeter bullet from a hole in the kitchen wall that later was proven to have been fired from the 9–millimeter Ruger found in Appellant's dresser drawer. Police discovered Kim's wallet, passport, and one hundred and thirteen boxes of merchandise in the storage unit rented by Appellant. Further, the towel used to wrap Kim's body matched the towels in Appellant's bathroom and Kim's empty truck was found in the Wal–Mart parking lot. After Appellant's arrest, Tonya and Cheena moved into his house. Shortly after moving in, Tonya found Kim's cellular phone on a shelf in Appellant's closet and turned it over to police.

Following a jury trial, Appellant was convicted of Kim's murder.

In his first point on appeal, Appellant asserts the trial court abused its discretion in granting the State's request to strike for cause two venirepersons, Tito Rojas ("Rojas") and Tammi Miller ("Miller"). Appellant maintains that both venire members indicated they could be fair and impartial, therefore, there was no basis for their removal and Appellant contends that as a result of their removal from the venire panel he was denied a full panel of qualified venire members from which to exercise his peremptory challenges.[6]

■ "If it appears that a venireperson cannot consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions in a first degree murder case, then the juror can be stricken for cause." *State v. Rousan*, 961 S.W.2d 831, 839 (Mo. banc 1998).

In our review, we commence with that portion of the State's voir dire of the venire panel which dealt with venire member Miller. During the death qualification portion of the State's voir dire, the following occurred:

The State: On number thirty-one [of the jury questionnaire] you said you could consider both life without the possibility of probation and parole and the death penalty; is that correct? You can consider both punishments?

Miller: I think I would have difficulty with the death penalty. I'd probably lean more towards—.

The Court: I can't hear you, ma'am.

---

5. Luminal is a chemical that reveals the presence of blood that cannot be detected with the naked eye.

6. We note that the State had previously announced its intention to seek the death penalty in this case. Therefore, in addition to questioning potential jurors about issues related to guilt and innocence, the defense was

required to have the opportunity to identify venire members whose views on the death penalty would or would not interfere with their verdict in the guilt phase. *State v. Clark*, 981 S.W.2d 143, 148 (Mo. banc 1998); *see also Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

Miller: I said I'd probably lean more towards life with parole than the death penalty. I think I would have difficulty.

The State: So, are you—well, only you know the answer to this. If you were on the jury and you were asked to vote, would you be able to listen to the evidence and consider the death penalty?

Miller: If I had no doubt, you know, of guilt, I could consider it.

The State: Well, if the instruction says that you—that that's not the instruction that I only have to prove it beyond a reasonable doubt, it's not all doubt.... In the guilt phase, knowing that's a possibility, are you going to hold me to a higher standard then?

Miller: (Nods head.)

The State: Is that a yes?

Miller: Yes

The State: Okay. Thank you.

Thereafter, during the defense's voir dire of Miller, the following exchange took place:

Defense Counsel: Okay. All right. Miss Miller, I think you were talking with [the State's counsel] about this—I'm going to move over here, I can't see you at all from over there because there are people in front of you. I think that you told [the State] that you would expect a higher level of proof from him in a death penalty case; is that—I don't want to put words in your mouth; is that what you said?

Miller: Yes, meaning that I guess that I would have to have no doubts in my mind, I guess.... I guess, yeah, if I understood the question right. I would say yes, I would have to have no doubt in my mind before I could consider death.

Defense Counsel: Okay.

Miller: I don't know if I'm—.

Defense Counsel: And I want to explore this with you a little bit further. I think I understand what you're saying but this is kind of technical here. Are—there's two stages of this trial; right? We talked about that. There's the stage where you as a juror will just be deciding whether or not the person is guilty of murder in the first degree; right?

Miller: Right.

Defense Counsel: Okay. At that point in time, you're not considering punishment; okay? That's a whole—that's a separate trial that happens afterwards; all right? Just in that part of the trial, just to find whether they are guilty or not guilty of murder in the first degree; would you be requiring more proof just to make that decision?

Miller: Yes.

Defense Counsel: Okay. So, you wouldn't be able to find somebody guilty if later on you had to consider the death penalty; is that what you're saying? And I'm not meaning to put you on the spot but—.

Miller: I guess I'm confused.

Defense Counsel: And that's okay. Because let me try to explain to you that there's this beyond a reasonable doubt is what the State has to prove to you to find somebody guilty in the first part of the trial; all right? You understand that?

Miller: Okay.

Defense Counsel: In the second part of the trial, they have to prove this aggravating circumstance beyond a reasonable doubt, okay, before you can go on to the other steps to consider the death penalty; okay? Now, just finding an aggravating circumstance beyond a reasonable doubt doesn't mean you automatically give the death penalty; do you understand that?

Miller: (Nods head affirmatively.)

Defense Counsel: It's only at the very end after you go through all those steps that I've been up here talking over and over about that you get to the point where you're deciding whether or not someone should receive the death penalty; do you understand that?

Miller: Yes.

Defense Counsel: Now, at that point, once you've done all this other stuff you may use whatever reasons you, as an individual, have to make your decision. So, at that point, it doesn't matter if it's beyond a reasonable doubt or if you want no doubt or—that is up to you. It's completely subjective, that decision of whether or not to give the death penalty; do you understand that?

Miller: Yes.

Defense Counsel: Now, knowing that at that point for the death penalty just talking about all the way to the end here; would you have a problem then with making that decision knowing it can be whatever standard you want. It can be beyond a shadow of a doubt, it doesn't matter.

Miller: I do. I could consider it.

Defense Counsel: Now, let's go backwards. At that first step, the State has to prove beyond a reasonable doubt whether or not an aggravating circumstance has been proven. At that step, would you require more than beyond a reasonable doubt?

Miller: No, I don't believe I would.

Defense Counsel: You would not? Whatever your answers are [they're] fine. I'm just trying to find out what you're thinking because I know nobody in this room has sat around thinking about this before except for the lawyers and the Judge sitting here. This is new to all of you. Now, I'm going to go back to the first part of the trial, when you're in the guilt phase. And the State, in

that part, has to prove the elements of murder in the first degree beyond a reasonable doubt; right? Would you require more proof in that part of the trial?

Miller: No.

Defense Counsel: Okay. So, really what you're saying is just at the end where you want to give the death penalty you really want a lot of proof before you can consider the death penalty?

Miller: Yes.

Defense Counsel: But in terms of finding someone guilty of murder in the first degree and considering life without probation and parole, you are fine with beyond a reasonable doubt; is that—?

Miller: Yes.

The Court: I couldn't hear you ma'am.

Miller: Yes.

The Court: Thank you.

Defense Counsel: Okay. It's just that ultimate decision where your personal belief is that you really want it to be a very, very high level of being convinced for you?

Miller: Uh-huh (Affirmative).

Additionally, Miller later indicated that she could "give realistic consideration to a sentence of life without probation and parole after finding someone guilty of murder in the first degree." Further, Miller noted that if she were chosen to serve on the jury it would be a hardship for her because she is the only employee at her office.

The State moved to strike Miller for cause because Miller "said that she would ... hold us to a higher standard of proof, beyond all doubt instead of beyond a reasonable doubt." Defense counsel objected to the strike and stated that Miller "was properly rehabilitated as to the burden of proof." After noting defense counsel's ob-

jection, the trial court struck Miller from the panel.

Later, a second group of venirepersons was empaneled. When the trial court questioned the panel as a whole about the imposition of the death penalty, Rojas responded affirmatively to both the question of whether anyone on the panel could not consider the death penalty and whether anyone on the panel would always vote to impose the death penalty following a conviction for murder in the first degree. Later, when the State asked if there was anyone on the panel that could not "ever consider the death penalty," Rojas raised his hand.

Upon defense counsel's voir dire of Rojas, the following exchange took place:

> Defense Counsel: Okay. And Mr. Rojas, I just want to clear this up because I think there are a few people who raised their hand a couple of times. You were saying you would not consider the death penalty; that's what you're—and the Judge asked both questions. Would you always give death? Would you always give life? And I think you were saying you want to always give life; is that what you were saying?
>
> Rojas: Yes.
>
> Defense Counsel: Is there any circumstance under which you could consider imposing a death sentence?
>
> Rojas: Well, that's something very hard for me.
>
> Defense Counsel: And I would hope that it is hard for people to do that but I am—I'm not asking you if it would be hard, I'm asking you: Would it be impossible?
>
> Rojas: I couldn't.
>
> Defense Counsel: I'm sorry? It could—?
>
> Rojas: No. It couldn't be impossible.

> Defense Counsel: It would not be impossible. There are extreme circumstances and extremely bad cases where you could give it real consideration?
>
> Rojas: Right.
>
> Defense Counsel: It's just something that you would find personally difficult?
>
> Rojas: Right.

At the conclusion of his voir dire, the State moved to strike Rojas for cause. Defense counsel objected and stated, "I think he was properly rehabilitated. He said while it would be difficult for him to do it, it was not impossible and he could consider it given the right circumstances." The State attempted to rebut defense counsel's assertions by noting that "[Rojas] only said [he could vote for the death penalty] in extreme cases." The trial court noted that it did not believe Rojas had been rehabilitated and allowed the strike for cause.

A defendant is entitled to a fair and impartial jury. U.S. CONST. amends. VI, XIV; MO. CONST. art. I, sec. 18(a) (1945, as amended 1976). One aspect of "the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492, 503 (1992). "The general rule is that a defendant is entitled to a full panel of qualified jurors before making peremptory challenges." *State v. George,* 921 S.W.2d 638, 646 (Mo.App. 1996). "However, the state, no less than the defendant, is entitled to an impartial jury." *Id.*

The purpose of voir dire is to discover bias or prejudice in order to select a fair and impartial jury. *State v. Leisure,* 749 S.W.2d 366, 373 (Mo. banc 1988). " 'In a capital murder case, inquiry into the venire members' views about the death penalty is of critical importance to the state, the defendant and the court.' "

*Id.* (quoting *State v. Antwine,* 743 S.W.2d 51, 60 (Mo. banc 1987)). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Morgan,* 504 U.S. at 729–730, 112 S.Ct. at 2230, 119 L.Ed.2d at 503.

"To qualify as a juror, the venireperson must be able to enter upon that service with an open mind free from bias and prejudice." *State v. Walton,* 796 S.W.2d 374, 377 (Mo. banc 1990). "The qualifications of a prospective juror are not determined conclusively by a single response 'but are made on the basis of the entire examination.' " *State v. Hauserman,* 64 S.W.3d 893, 896 (Mo.App.2002) (quoting *State v. Brown,* 902 S.W.2d 278, 285 (Mo. banc 1995)). A trial court cannot exclude a venireperson from a capital punishment case simply because of a conscientious objection to the death penalty; however, a venireperson may be excluded if his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *State v. Clemons,* 946 S.W.2d 206, 225 (Mo. banc 1997). As previously set out, "[a] venireperson is not qualified to sit in a death-penalty case if it appears that he or she cannot consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions." *State v. Anderson,* 79 S.W.3d 420, 434 (Mo. banc 2002).

"A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it clearly is against the weight of the evidence and is a clear abuse of discretion." *Id.; see Johnson,* 95 S.W.3d at 226–27. " 'No clear line can be drawn as to when a challenge for cause

should or should not be sustained; each case must be judged on its particular facts.' " *George,* 921 S.W.2d at 645–46 (quoting *State v. Draper,* 675 S.W.2d 863, 865 (Mo. banc 1984)). "A party asserting an abuse of discretion has the burden of showing a real probability that he was thereby prejudiced." *State v. Haley,* 73 S.W.3d 746, 755 (Mo.App.2002). Notably, "the applicable standard does not require that a venireperson's bias be proven with 'unmistakable clarity.' " *State v. Winfield,* 5 S.W.3d 505, 511 (Mo. banc 1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000).

Appellant argues that while Rojas and Miller initially gave answers indicating they might not be qualified as jurors, they were ultimately rehabilitated to the point that they gave unequivocal assurances of impartiality and did not show a bias for or against either party.

When faced with contradictory responses from a venireperson regarding his or her qualifications to serve on a jury, a trial court does not abuse its discretion by giving more weight to one response than the other and in finding that the venireperson could not properly consider the death penalty. *State v. Kinder,* 942 S.W.2d 313, 324–25 (Mo. banc 1996). "We are not bound solely by the statements favoring [Appellant's] position because the ruling on a challenge for cause is to be based on the whole record." *Id.*

Here, Miller and Rojas gave equivocal and shifting responses to questions focusing on their ability to impose the death penalty. Among her earlier responses to questioning, Miller indicated that she "would have difficulty with the death penalty", and would "lean more towards life with parole." Later, she stated she "could consider it." Additionally, it appeared that Miller was either confused

by or unable to follow the standard of proof as outlined by the State. Miller stated that she could only consider imposing the death penalty if she had "no doubt" about Appellant's guilt.

 As for Rojas, he indicated that imposing the death penalty would be "something very hard for [him]" and that he would always want to set the punishment at life imprisonment. Thereafter, he stated that he might be able to impose the death penalty in "extreme circumstances and extremely bad cases."

 The trial court is allowed in its broad discretion to determine that a venireperson's most credible answers were the ones that indicated he or she was not able to impose the death penalty, and that his or her answers "on the whole, were equivocal and, hence, disqualifying." *State v. Christeson,* 50 S.W.3d 251, 265 (Mo. banc 2001). It is for the trial court to determine whether a challenged member of the panel could be an impartial juror. *Walton,* 796 S.W.2d at 377.

Here, the record supports the trial court's determination that the views of Miller and Rojas "would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath." *Rousan,* 961 S.W.2d at 839. Based on the trial court's superior position to evaluate the venirepersons' respective demeanor and testimony, we cannot say the trial court erred by abusing its discretion in striking Miller and Rojas for cause. *See State v. Storey,* 40 S.W.3d 898, 904–05 (Mo. banc 2001). Point denied.

In his second point, Appellant posits that his due process rights were violated when the trial court overruled his objection and denied his request for a curative instruction or a mistrial following the State's rebuttal to Appellant's closing arguments.

We observe that in his closing argument Appellant asserted the State, in its closing argument, had *not* brought up the name of "Kim Clevenger," although Clevenger was the person who led police to Appellant's home. In the rebuttal portion of its closing argument, the State admitted not calling Kim Clevenger to the witness stand, but asserted that Clevenger could have been called by Appellant, instead. The State then argued "that the reason Appellant had not called Kim Clevenger as a witness was because Appellant knew that if called, Clevenger would testify that Appellant shot Kim." Appellant maintains the State's argument provided the jury with facts that were not introduced at trial, thereby improperly bolstering the State's case against him.

The record reveals that in Appellant's closing argument counsel argued, in pertinent part:

> And the State stands here telling you to convict [Appellant] for first degree murder, deliberate murder with cool reflection. Let's look at what they've brought to you and let's look at what they didn't bring to you. *The State didn't even the name [sic] in the whole closing argument you heard in this case, Kim Clevenger. What [sic] we know about Kim Clevenger? We know she's the person who puts the whole case into motion. She's the person who goes to the Joplin Police Department and says: I was at that house, a man was killed there. I witnessed it. And because of Kim Clevenger the Joplin police do go out and set up surveillance.* And [the State] suggest they were just somehow clairvoyant and went out to that address and started doing a stakeout. No. They had a witness who told them to go there.

And that witness told them where to look in that house. And in that house where she told them to look was a knife. Remember officer Gallup testified that knife right there (indicating) that round table (indicating). Detective Meyer primary focus of the investigation (indicating) that's because Kim Clevenger told them where to look. They want you to convict [Appellant] of murder in the first degree but they don't bring you Kim Clevenger. They have the burden.

(Emphasis added.)

Then during the State's rebuttal argument, the following exchange took place:

The State: Kim Clevenger. We didn't call Kim Clevenger. That is true. We didn't need to call Kim Clevenger. If they wanted to call Kim Clevenger—.

Defense Counsel: Objection. Improper burden shifting.

The Court: Objection's overruled.

The State: They're asking why she wasn't here. If they thought she had such vital information, they could have brought her in here. But do you know why they didn't? We talked about how we relied on the information that was here in this circle (indicating) because she said he did the murder.

Defense Counsel: Objection, Your Honor. May we approach?

The Court: No, objection's overruled. You may proceed.

The State: That's why they didn't bring her in here. She's the one who gave the information that he did the murder.

As previously related, after the jury began its deliberations, counsel for Appellant moved for "a mistrial based on the improper closing argument of [the State] testifying as to statements of Kim Clevenger, indicating that she told the police the defendant shot the victim. There was abso-

lutely no evidence introduced whatsoever to support that argument."

In overruling the request for a mistrial, the trial court told defense counsel that it thought defense counsel "opened [that issue] up in your portion of the closing arguments." In addition to moving for a mistrial, Appellant's counsel requested that the jury be given a curative instruction related to the State's comments in closing argument. The trial court stated that it did not "consider it an improper closing argument" and overruled the request.

"The granting of a mistrial is a drastic remedy that should be used only when necessary to cure grievous prejudice, and in extraordinary circumstances where the prejudice to the defendant cannot be removed by other means." *State v. Cunningham*, 32 S.W.3d 217, 219 (Mo.App. 2000). "The trial court's discretion to overrule a motion for mistrial will not be overturned absent a finding that it abused its discretion." *State v. Myers*, 997 S.W.2d 26, 35 (Mo.App.1999).

The "'trial court has broad discretion in controlling the scope of closing argument, and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant.'" *Cunningham*, 32 S.W.3d at 219 (quoting *State v. Ferguson*, 20 S.W.3d 485, 498 (Mo. banc 2000)). An abuse of discretion will not be found unless the statements were clearly unwarranted and had a decisive effect on the jury. *State v. Davis*, 825 S.W.2d 948, 951–52 (Mo.App.1992). Comments have a decisive effect on the jury when there is a reasonable probability that, in the absence of these comments, the verdict would have been different. *State v. Wright*, 941 S.W.2d 877, 881 (Mo.App.1997). The burden is on Appellant to prove the decisive significance of the comments. *State v.*

*Sullivan,* 935 S.W.2d 747, 759 (Mo.App. 1996). Further, "this state has not adopted a per se rule of mandatory reversal in all cases in which objectionable comments are made by a prosecutor." *State v. Hibbert,* 14 S.W.3d 249, 254 (Mo.App. 2000).

■ In closing argument, the State may "make reasonable inferences from the evidence" and may "argue the credibility of witnesses as long as the arguments are based upon the evidence presented at trial." *Vicory v. State,* 81 S.W.3d 725, 731 (Mo.App.2002).

■ Generally, in closing argument, the State may not argue an adverse inference from the defendant's failure to call a witness who is equally available to both parties, or unavailable to both parties.[7] *State v. Wallace,* 43 S.W.3d 398, 404 (Mo. App.2001). "However, a well-established exception exists where the State's comments are made in retaliation to answer arguments made in the defendant's closing."[8] *State v. Crump,* 875 S.W.2d 241, 242 (Mo.App.1994). The State is given considerably more leeway in closing argument when the argument is retaliatory in nature. *State v. Parker,* 886 S.W.2d 908, 922 (Mo. banc 1994). "Even if the argument would otherwise be improper, a prosecutor may retaliate to an issue raised in the closing argument of Defendant." *State v. Matchett,* 69 S.W.3d 493, 500 (Mo. App.2001).

Appellant has not persuaded this Court that the statements made by the prosecutor regarding Clevenger were decisive in influencing the jury's verdict.

■ Here, Appellant first raised the issue of Clevenger's absence from the trial when Appellant's counsel commented to the jury that "[the State] want[s] you to convict [Appellant] of murder in the first degree but they don't bring you Kim Clevenger." Thereafter, the State made a retaliatory argument that it "didn't need to call Kim Clevenger" and if the defense "thought [Clevenger] had such vital information, they could have brought her in here."

The present situation is similar to that found in *State v. Crump,* 875 S.W.2d 241 (Mo.App.1994). In *Crump,* as a response to defense counsel's comment during closing argument that "the State hasn't brought in" a particular witness, the State argued, "If that guy had anything valuable to say [the defense] can subpoena him in here and they can put him on the stand and they can make him testify. They could have brought him in here. He's not here because he would have heard [sic] the defendant." *Id.* at 242. The appellate

---

7. In the argument portion of his brief, Appellant asserts that "Clevenger was equally available to both parties." However, Appellant failed to raise this issue in his point relied on. As " 'issues raised only in the argument portion of the brief are not presented for review,' " we do not consider Appellant's assertion. *State v. Evans,* 992 S.W.2d 275, 286 (Mo.App.1999) (quoting *State v. Garcia,* 930 S.W.2d 469, 473 (Mo.App.1996)).

8. Absent the aforementioned exception, "[o]nly when the missing witness is 'peculiarly available' to one party should the court consider whether the party's failure to call the witness supports the inference that the witness could have testified adversely to that party if called." *State v. Crawford,* 32 S.W.3d 201, 206–207 (Mo.App.2000) (quoting *State v. Anderson,* 867 S.W.2d 571, 576 (Mo.App. 1993)). " '*Equally available* means more than merely being susceptible to service of process and is determined by consideration of the following three factors: (1) one party's superior ability to know or identify the witness; (2) the nature of the testimony expected to be given by the witness; and (3) a relationship between a party and the witness which indicates a likelihood that the witness would testify more favorably for one party than the other.' " *Id.* (quoting *Anderson,* 867 S.W.2d at 576).

court ruled that "[t]he State's comments were proper retaliation" and denied Appellant's point. *Id.*

Similarly, in *State v. Fair,* 699 S.W.2d 14, 15 (Mo.App.1985), defense counsel stated in closing argument, "where are the other witnesses, the ambulance attendants, to verify it? They are not here. [The State] didn't bring them in here to verify that[.]" In retaliation, in the rebuttal portion of its closing argument, the State replied, "The ambulance drivers aren't here. True. Defense counsel brought witnesses in—she's a good attorney and don't you think if those ambulance drivers contradicted the State's case that she'd have them sitting right there?" *Id.* The appellate court ruled that "[s]ince the defense here first raised the adverse inference as to the absence of the equally available ambulance attendants, there was no error in the state's retaliation." *Id.* at 16.

Based upon the foregoing, we determine that in the instant matter the State's retaliatory mention of Clevenger in its closing argument was a permissible use of retaliatory remarks. *See id.*

■ Appellant further maintains that "[b]y arguing that [Clevenger] would have testified that Appellant shot Kim, the prosecutor provided the jury with facts that had not been introduced at trial and which implied knowledge on his part that bolstered the State's case against Appellant."

In closing argument, the State is allowed to argue "legitimate inferences from the evidence but may not imply a knowledge of facts not before the jury." *State v. Rhodes,* 988 S.W.2d 521, 527 (Mo. banc 1999). In closing argument, assertions of facts that were not proven during trial amount to unsworn testimony by the State. *State v. Black,* 50 S.W.3d 778, 791 (Mo. banc 2001).

■ Here, the State did not refer to facts outside of the record when it stated that Clevenger was "the one who gave the information that [Appellant] did the murder" and that "she said [Appellant] did the murder." First, there was evidence to support that statement, including Officer James Altic's testimony that Clevenger was the witness who reported the homicide to the Joplin Police Department. Second, based on the fact that the State's argument was in direct retaliation to Appellant's statements in closing argument, Appellant will not be permitted to "provoke reply by arguing outside of the record [in his closing argument] and then assert error based on the State's retaliation [upon rebuttal argument]." *State v. Johns,* 34 S.W.3d 93, 117 (Mo. banc 2000); *see also State v. Hall,* 982 S.W.2d 675, 683 (Mo. banc 1998). Furthermore, even if the State's argument had been improper, and the State had, indeed, argued facts outside of the record as asserted by Appellant, Appellant retains the burden of proving that the State's comments had a decisive effect on the jury's verdict. *See Sullivan,* 935 S.W.2d at 759. It has been held that " '[e]rror which in a close case might call for a reversal may be disregarded as harmless when the evidence of guilt is strong.' " *Wright,* 941 S.W.2d at 883 (quoting *State v. Roberts,* 838 S.W.2d 126, 131 (Mo.App.1992)). In view of the strong evidence against Appellant as set out previously, we cannot say that the State's remarks resulted in a jury verdict different from that which was returned, thereby prejudicing Appellant. *See id.* Point two is denied.

The judgment of the trial court is affirmed.

PARRISH, P.J., and SHRUM, J., concur.