**STATE of Missouri, Plaintiff-Respondent,**

v.

**Carl Lee JACKSON, Defendant-Appellant.**

**No. SD 34542**

Missouri Court of Appeals,
Southern District,
Division Two.

Filed: June 29, 2017

---

Attorneys for Appellant—Emmett D. Queener, Margaret M. Johnston of Columbia, MO.

Attorneys for Respondent—Joshua D. Hawley (Attorney General), Garrick Aplin of Jefferson City, MO.

Nancy Steffen Rahmeyer, J.

A jury found Carl Lee Jackson ("Defendant") guilty of murder in the first degree, armed criminal action, and burglary in the first degree based on events that occurred in October 2014.[1] The jury assessed and declared punishment for these offenses—mandatory life in prison without eligibility for probation or parole for murder in the first degree, twenty years for armed criminal action, and fifteen years for burglary in the first degree. The trial court imposed that punishment, and ordered the sentences to run concurrently with each other. Defendant appeals challenging in two points the sufficiency of the evidence to support the jury's verdict finding him guilty of murder in the first degree, and a single comment in the prosecutor's closing argument. We reject Defendant's points, and affirm the trial court's judgment.

## Procedural History and Evidence Presented at Trial

Defendant was charged by amended information with (1) murder in the first degree in that Defendant "after deliberation, knowingly caused the death of [Victim] by shooting him," (2) armed criminal action in that Defendant committed the murder "by . . . the knowing use, assistance and aid of a deadly weapon," (3) burglary in the first degree in that Defendant unlawfully entered Victim's home for the purpose of committing theft, and (4) robbery in the first degree in that Defendant "forcibly stole [a] British .303 rifle owned by [Victim]" based on events that occurred in October 2014.

The jury was presented with the following evidence.[2] Robert Jackson, who was Defendant's nephew and one of Defendant's male accomplices, testified as follows. Defendant is "at least . . . about ten years" older than Robert.[3] Defendant and Robert "occasionally" sold "weed" together. Richard Knee, who also was known as Junior and was Defendant's second male accomplice, was Robert's "distant cousin." Defendant's female accomplice was Tomi Stanley. Robert "met [Tomi] through [Richard]," and Tomi "would buy weed from" Robert.

In October 2014, based on what Tomi told the men, Robert expected to find a "whole lot of marijuana" at Victim's—Robert's "estimation" was "25 pounds or more." On October 22nd, Defendant, Richard and Robert drove in Defendant's truck to Tomi's house. Before leaving for Tomi's house, Robert and Defendant placed an "AR-15," an "AR-22" and a "Ruger .22" under the backseat of Defendant's truck. While at Defendant's house, Defendant got three masks—one for himself, and one each for Robert and Richard—to use later at Victim's house. At Tomi's house, Tomi told the men "where . . . all the weed would be and how the house was set up." Tomi said the men should enter the back door, which "lead[s] into the victim's

---

1. The jury found Defendant not guilty of robbery.

2. While we recite the evidence presented at trial to give the reader context for Defendant's argument, we view that evidence in accordance with our standard of review, *infra,* in deciding this appeal.

3. We use given names herein for purposes of clarity only. No disrespect is intended.

room." Tomi then drove the three men to Victim's house in Tomi's automobile. Each of the men had a "gun." During the drive, Tomi told the men they:

> would encounter three males in the sitting room. Two were to be about my age, a little bit younger, that they would not fight back, that they would just do what we wanted them to, and the other one would carry a key around his neck leading to the safe where all the weed was.

When the group arrived at Victim's house, Tomi "said she was going to wait in the car." Defendant instructed Robert and Richard to put on their masks, but declined to wear his own mask because "he said he could not breathe in it, so he took it off, and he had his hood up on his hoodie." Robert and Richard wore their masks. Defendant entered Victim's house first, then Robert followed by Richard. On entering the house, Robert "heard a man start cussing, a dog start barking, and then I heard a gunshot go off." The men told the people in the house "to get on the ground," and then Robert "was told" to take "[a] younger man" "into the kitchen." From the kitchen, Robert could see an "elderly woman" "sitting in a chair in front of the TV." [4] Defendant told Robert to "tie [the man and woman] up." Robert did so. While Robert "was dealing with the people in the living room," Robert "heard some yelling, and then ... some more gunshots." Robert then heard "[l]et's go," and the three men left Victim's house by the same door they came in. As Robert left the house, he observed Victim lying on the ground. "A couple of canisters" that

smelled "like weed and a rifle" were taken from Victim's house.

Tomi had left while the three men were inside Victim's house so the men "ran up" a dirt road and "laid down in the grass" in a clearing. After a time, Tomi returned, picked the three men up and returned to her house. The three men than "loaded up the truck" and left. Subsequently, Robert told Defendant that Robert "wanted" an "antique" "British .303 rifle" and "kind of took it." Robert "wasn't aware [the rifle had come from Victim's house], but ... had a suspicion."

Richard Knee, Jr. also testified, and added the following evidence. Richard met Defendant through Robert. "[A]t various times," Richard and Robert "engaged in selling marijuana." Tomi is Richard's aunt, and Tomi and Richard were close. Richard learned about Victim through Tomi. Richard acknowledged that Defendant and Robert had rifles at Victim's house, but denied that Richard had a gun; however, Richard Tyrell ("Ty") Hackett, who was Victim's friend and present in Victim's home when Victim was shot, testified that all three men were "armed"—"[o]ne was a long gun" and Ty "believe[d] two were pistols." Victim's mother also testified that "all three of those men had guns."

Richard testified that the three men knocked on Victim's front door, but actually entered Victim's house through a door "at the end of the trailer" that led into a bedroom. Robert wore a mask, Richard had a mask on the top of his head but did not pull the mask down over his face, and Defendant did not have a mask.[5] As Defendant entered Victim's house, Defendant

---

4.  Victim's mother, who was present in Victim's home when Victim was shot, testified that one of the men "stayed in the kitchen and never left the kitchen until" the men "took off."

5.  Victim's mother testified that "[t]wo of them had masks on, one of them didn't."

"shot the dog." [6] The dog was not posing any threat to Defendant to Richard's knowledge.[7] Victim was never tied up. Richard was with Victim in the bedroom, and Victim "was supposed to be opening the safe." Victim got a pistol "off the top of the safe," and pointed the pistol at Richard.[8]

Richard "put [his] hands up and hollered for [Defendant], and told him that he had a gun." Defendant "come around the corner and [Defendant and Victim] started arguing." Each was telling the other to put the gun down, and Victim also "was telling us to leave his house." Victim "was moving the gun back and forth from" Richard to Defendant. Defendant told Victim he was going to count to three; then counted one, two and shot Victim three times. To Richard, "[i]t looked like" Victim was shot in the leg.[9] Defendant then "opened the safe" and handed Richard two jars—one jar was empty and one jar contained empty sandwich bags. Richard was not aware of any other property being taken out of Victim's house that night. Defendant "seem[ed] calm" when he counted, when he shot Victim, and when he looked through Victim's safe after shooting Victim. When the three men left Victim's house, Defendant and Robert still were "armed," and when Richard last saw Victim, Victim "was still talking." A day or two later, Defendant told Richard that Victim died. Defendant also "threatened to kill [Richard] and [his] family multiple times."

In the evening on October 22, 2014, McDonald County Sheriff Michael Hall responded to a reported "shooting in a home invasion." Sheriff Hall was the first law enforcement officer to arrive at the scene. Sheriff Hall also is an "EMT," and determined Victim was dead. Sheriff Hall observed a dead dog inside Victim's house, and a shell casing near the dog.[10] Sheriff Hall also observed through a "pretty large crack" an unknown number of marijuana plants in a locked room in Victim's house. Sheriff Hall took a picture of Victim that shows a wound in Victim's "upper left chest"—Sheriff Hall described the wound as "right above his left ... nipple area." Sheriff Hall observed "[s]everal—I would assume at the time it was bullet entry wounds" on Victim, and blood on and around Victim.[11] Sheriff Hall also testified that "[t]here was some indications that [Victim] was also shot in the groin area." One shell casing was located "underneath" Victim.

Joseph Houdyshell, "a narcotics detective with Ozarks Drug Enforcement team,"

6. Richard knew Defendant shot the dog because Defendant "admitted to it after" the three men left. Ty also testified that the men shot the dog "[a]s soon as they came in the backdoor."

7. Victim's nephew, James Collins, testified that the dog was "a gentle dog," and was not aggressive. Ty testified that the dog, a pit bull, was "never" aggressive, and was not considered to be a watchdog. Victim's mother testified that Victim's pit bull would "[b]ark. That's all he ever—he just barked."

8. James Collins testified that Victim kept a ".45" on a bookshelf "in his bedroom close to the safe."

9. Ty testified that, after he heard three gunshots, one of the three men came into the kitchen where Ty was tied up and told him " 'We shot your friend in the foot. He tried to play funny. We shot him in the foot. You're going to need to take him to the hospital.' " Victim's mother also testified that one of the men told her " '[w]e're just going to just shoot him in the foot.' "

10. James Collins testified that the dog was located in "the first part of" Victim's room.

11. James Collins testified that, when he first found Victim, he tried to place a towel over a wound in Victim's "lower right stomach area" that was bleeding.

told the jury the following. In a search of Defendant's home in March 2015, a "lower for an AR-15 rifle" and a "British .303 rifle" were seized. Defendant and Robert were present in the home at the time of the search. The "lower" includes the "trigger mechanism and the butt stock" and does not include "the bolt, the chamber, and the barrel." [12] Defendant told Detective Houdyshell that the "lower" was Defendant's, and Defendant sold the "upper" to a person "in Grove." [13] Defendant told Detective Houdyshell the British .303 rifle "was Robert's."

Brandon Barrett, a lieutenant with the McDonald County Sheriff's Department, "collect[ed] physical evidence" at Victim's house. According to Lt. Barrett, the dog at Victim's house "looked as though it had [died] as a result of a gunshot wound." In the "immediate vicinity" of the dog, law enforcement officers "collected two spent .223 [shell] casings"—one of which was found by a doorway. A third spent .223 shell casing was found in Victim's bedroom. Lt. Barrett received an upper for a .223 AR-15 from a person who lived with Defendant "within a couple of days" after Defendant "acknowledged" "he had . . . the lower to an AR-15." Lt. Barrett sent the three shell casings from Victim's home, the lower of the AR-15 seized in the search of Defendant's home and the upper of the AR-15 received from a person who lived with Defendant to the crime lab "[t]o see if they could get a match on the shell casings and the . . . weapon itself." The shell casings recovered from Victim's home that were sent to the crime lab "matched the—

were fired from the AR-15 . . . of [Defendant]." Victim's "family" told law enforcement that a British .303 rifle was taken in the "incident," and subsequently provided law enforcement with a serial number for the rifle that matched the serial number of the British .303 rifle seized in the search of Defendant's home. [14]

Alexander A. Belt, who was employed by the Missouri State Highway Patrol crime laboratory division, testified as follows. Mr. Belt's "specialty is" "[f]irearm and tool marks." Mr. Belt concluded that the shell casings recovered from Victim's home were "fired from" the combined lower of an AR-15 seized from Defendant's home and upper of an AR-15 received by Lt. Barrett from a person who lived with Defendant.

Defendant did not testify, and did not call any witnesses.

Early in the prosecutor's closing argument, the following argument, objection and ruling occurred:

> Both of our witnesses at the scene put [Defendant] as the first man in the door. [Defendant] was carrying a weapon, his weapon, this weapon, a .223 AR-15 assault rifle, and when he came through that door into the back of [Victim's] room, the first thing he did was shoot the dog. Now, was the dog a threat? Pretty much everybody who testified said no. It might bark, but he wasn't aggressive. I don't think that [Defendant] killed the dog because he was aggressive. [Defendant] killed the dog because he was ready to—

---

**12.** Brandon Barrett, a lieutenant with the McDonald County Sheriff's Department, subsequently testified that the upper also includes the "firing pin."

**13.** Grove, Oklahoma.

**14.** James Collins, Victim's nephew, testified that he informed law enforcement the rifle was missing. James Collins also identified the British .303 rifle seized in the search of Defendant's home as Victim's rifle. James further testified that "the last time" he saw the rifle at Victim's house was earlier in the day on October 22, 2014.

[Defense Counsel]: Objection, your Honor. It's speculation.

THE COURT: You can draw reasonable inference, so it's argument, so proceed.

[Prosecutor]: Thank you. He was ready to kill someone. He came with an assault rifle that was locked and loaded and the first thing he saw coming through that door, he put down. Even before Robert who was right on his tail came in, even before Richard who was right after Robert came in, that shot was fired and the first victim was dead on the floor.

Subsequently, in his reply closing argument, the prosecutor added, in connection with his argument on the charge of robbery, that Defendant's "initial show of force was to shoot the dog."

### Analysis

*Point I—Claim that Evidence Was Insufficient to Support the Jury's Verdict that Defendant Was Guilty of Murder in the First Degree*

In his first point, Defendant claims that the evidence was insufficient to permit a reasonable fact-finder to "find beyond a reasonable doubt that [Defendant] had the intention to kill [Victim]; although the gunshot wounds to [Victim] allow an inference of recklessly causing death for involuntary manslaughter." We reject Defendant's point.

"To determine whether the evidence presented was sufficient to support a conviction and to withstand a motion for judgment of acquittal,[15] this Court does not weigh the evidence but rather accept[s] as true all evidence tending to prove guilt together with all reasonable

inferences that support the verdict, and ignore[s] all contrary evidence and inferences." *State v. Ess*, 453 S.W.3d 196, 206 (Mo. banc 2015) (internal quotations omitted). This Court, however, "may not supply missing evidence, or give the [state] the benefit of unreasonable, speculative or forced inferences." *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (internal quotations omitted). Evidence is sufficient to support a conviction when "there is sufficient evidence from which a reasonable [fact-finder] might have found the defendant guilty beyond a reasonable doubt." *State v. Coleman*, 463 S.W.3d 353, 354 (Mo. banc 2015); *see also Musacchio v. United States*, ── U.S. ──, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016).

*State v. Clark*, 490 S.W.3d 704, 707 (Mo. banc 2016) (brackets in original except for footnote). Further, "[i]nferences contrary to the verdict are disregarded 'unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them.' *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993)." *State v. Kopp*, 325 S.W.3d 466, 467, 471 n.6 (Mo. App. S.D. 2010).

■ Defendant's argument challenges a mental state that the State did not have the burden of proving—i.e., "intention to kill." A person commits murder in the first degree if the person "knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1, RSMo Cum.Supp. 2014. A person "acts knowingly" with respect to a result of the person's conduct when the person "is aware that his conduct is practically certain to cause that result." Section 562.016.3(2), RSMo 2000. MAI-CR 3d 313.02 (1-1-04) for murder in

---

15. Both issues are analyzed under the same standard of review. *State v. Browning*, 357 S.W.3d 229, 233 (Mo. App. S.D. 2012).

the first degree includes alternate phrasings for the second element of the offense:

(If) you find and believe from the evidence beyond a reasonable doubt:

. . . .

Second, [*Insert one or more of the following. Omit brackets and number. "2" should be used, by itself or with "1," only at the request of the state. See Notes on Use 2.*]

[1] that defendant (knew) (or) (was aware) that his conduct (was causing) (or) (was practically certain to cause) the death of [*name of victim*] (,) (or)

[2] that it was the defendant's purpose to cause the death of [*name of victim*],

. . . .

Notes on Use 2 further explains, in part:

For first degree murder a person must "knowingly" cause "the death of another person after deliberation upon the matter." Paragraph First of this instruction covers the causation element. Paragraph Second deals with the culpable mental state of "knowingly causes the death" and paragraph Third covers the mental state of deliberation.

Paragraph Second provides for alternative methods of submission of the culpable mental state of knowingly causing the death, and is based on Section 562.016.3, RSMo 2000, which defines "knowingly." The definition of knowingly as it relates to a "result" (and death is clearly a result in homicide offenses) is:

"A person 'acts knowingly' . . . with respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result."

The language after "[1]" provides for submission in the terms of this definition

. . . .

There will be cases where the evidence will show that it was the defendant's purpose to cause death. Es-

tablishing "purpose" is sufficient to establish "knowingly." See Section 562.021.3, RSMo 2000. There may be times when the state is willing to accept the higher burden and submit the case on the basis of "purpose" rather than "knowing." The language after "[2]" permits this. However, "[2]" should never be submitted, either alone or together, with "[1]" unless the state so requests.

Finally, section 562.016.2 provides that "[a] person 'acts purposely', or with purpose, with respect to his conduct or to a result thereof when it is his conscious object to engage in that conduct or to cause that result." In this case, the trial court instructed the jury only with respect to the statutory definition of "acts knowingly," and the State did not accept the higher burden of proving that it was Defendant's purpose to cause Victim's death.

■ Although Defendant refers to judicial decisions discussing deliberation in his argument under this point, Defendant does not appear to challenge the sufficiency of the evidence to show Defendant caused Victim's death after deliberation. Deliberation "means cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo 2000. Defendant's failure is understandable in light of the essentially undisputed evidence showing that Defendant and his two male accomplices forced their way into Defendant's home at night armed with firearms, and Defendant immediately shot Defendant's pit bull and subsequently shot Victim three times in the torso with an assault rifle after counting to two when he had given Victim until three to put down Victim's own gun. "Deliberation is not a question of time—an instant is sufficient—and the reference to 'cool reflection' does not require that the defendant be detached or disinterested. Instead, the element of deliberation serves to

ensure that the jury believes the defendant acted deliberately, consciously and not reflexively." *State v. Nathan*, 404 S.W.3d 253, 266 (Mo. banc 2013). Our Supreme Court also specifically mentioned "[t]he prominent use and display of [two handguns]" by the defendant and an accomplice in its recitation of evidence that supported "a finding of deliberation" in that case. *Id.*

■ The evidence was sufficient to permit a reasonable fact-finder to conclude beyond a reasonable doubt that Defendant knew his conduct was practically certain to cause Victim's death. After giving Victim until the count of three to put down Victim's own gun in a stand-off between Victim on the one hand and Defendant and one of his accomplices on the other hand, Defendant shot Victim three times in the torso with an assault rifle after counting one, two and before Defendant actually reached three. One of the bullets struck Victim just above his left nipple, one struck Victim in the lower right stomach, and one struck Victim in the groin. From this evidence, a reasonable juror certainly could have inferred beyond a reasonable doubt that Defendant knew shooting Victim with an assault rifle three times in the torso where most of a human's vital organs and blood vessels are located was practically certain to cause Victim's death.

Defendant's first point is denied.

### Point II—Claim that Prosecutor's Comment in Closing Argument Was Improper

■ In his second point, Defendant contends that the trial court "abused its discretion in permitting" the prosecutor to argue to the jury that Defendant "shot the dog when he entered the house because '[h]e was ready to kill someone,'" in that "this argument was not based on any evidence admitted at trial and amounted to unsworn testimony by the [prosecutor]

that was not subject to cross-examination." We disagree.

A trial court "has broad discretion in controlling closing argument and counsel is afforded wide latitude during summations." *State v. Thompson*, 390 S.W.3d 171, 174 (Mo. App. E.D. 2012). We review rulings made during closing argument for abuse of discretion. *State v. Smith*, 422 S.W.3d 411, 415 (Mo. App. W.D. 2013). "Unless that discretion has been clearly abused to the prejudice of the accused, the trial court's ruling should not be disturbed on appeal." *Id.* In order to establish prejudice, the burden is on the defendant to show there is a reasonable probability the verdict would have been different absent the trial court's abuse. *Id.* at 418.

*State v. Joseph*, 515 S.W.3d 735, 750 (Mo. App. E.D. 2016). And, "[i]n determining the propriety of the closing argument, we interpret the challenged comment in light of the entire record rather than in isolation." *State v. Taylor*, 407 S.W.3d 153, 161 (Mo. App. E.D. 2013). Finally:

In closing argument, the State is allowed to argue "legitimate inferences from the evidence but may not imply a knowledge of facts not before the jury." *State v. Rhodes*, 988 S.W.2d 521, 527 (Mo. banc 1999). In closing argument, assertions of facts that were not proven during trial amount to unsworn testimony by the State. *State v. Black*, 50 S.W.3d 778, 791 (Mo. banc 2001).

*State v. Tinsley*, 143 S.W.3d 722, 736 (Mo. App. S.D. 2004).

The trial court ruled that the prosecutor was drawing a reasonable inference, and permitted the argument. We believe the trial court was correct. In *Nathan*, 404 S.W.3d at 266, our Supreme Court referred to a very similar inference of deliberation when it stated:

[The defendant and his accomplice] both brought guns to help them control and coerce the victims during the robbery. The prominent use and display of these weapons was a clear (albeit non-verbal) threat that both [the defendant and his accomplice] would kill the victims if they did not cooperate, and both men made such threats verbally as well.

In this case, the prosecutor could legitimately argue from the evidence that Defendant shot Victim's pit bull to impress upon Victim that Defendant was prepared to use his firearm if necessary to effectuate the burglary successfully. The prosecutor's argument was a short-hand version of this inference, and was not improper argument. We also note that the evidence essentially was undisputed that Defendant, in the process of attempting to steal marijuana from Victim, forced his way into Victim's home at night along with two male accomplices, immediately shot Victim's pit bull, and subsequently shot Victim three times in the torso with an assault rifle after counting to two when he had given Victim until three to put down Victim's own gun. In light of the undisputed evidence and entire record (including the jury's not guilty verdict on the robbery charge), Defendant fails to persuade us that there is a reasonable probability the verdict would have been different absent the prosecutor's challenged comment.

Defendant's second point is denied, and the trial court's judgment is affirmed.

Gary W. Lynch, P.J.—Concurs

Daniel E. Scott, J.—Concurs