**STATE of Missouri, Respondent/Cross-Appellant,**

v.

**Ledale NATHAN, Appellant/Cross-Respondent.**

**No. SC 92979.**

Supreme Court of Missouri, En Banc.

July 30, 2013.

---

Jessica M. Hathaway, Public Defender's Office, St. Louis, for Nathan.

Evan J. Buchheim, Attorney General's Office, Jefferson City, for State.

Stephan Douglas Bonney, ACLU Foundation of Kansas and Western Missouri, Kansas City, Anthony E. Rothert, Grant R. Doty, ACLU of Eastern Missouri, St. Louis for The American Civil Liberties Union.

PAUL C. WILSON, Judge.

Mr. Nathan was found guilty of first-degree murder for the death of Gina Stallis that occurred during a robbery and home invasion. He was 16 years old at the time he committed those crimes. The jury found Nathan guilty of 12 counts of burglary, assault, robbery and kidnapping in addition to the first-degree murder charge, and found him guilty of 13 associated counts of armed criminal action. After the jury returned these verdicts, Nathan waived jury sentencing pursuant to section 557.036.4(1).[1]

The trial court sentenced Nathan to life in prison with no possibility of parole for first-degree murder. The trial court also sentenced Nathan to five life sentences (with parole) and five 15–year sentences for the non-homicide crimes, all of which were to be served consecutively to each

1. Unless otherwise noted, the statutes cited herein are those in effect on the date of this opinion and found either in RSMo 2000 or the 2012 supplement thereto.

other and to the sentence for first-degree murder. Finally, the trial court sentenced Nathan to eleven life sentences (with parole) for armed criminal action, with these sentences to be served concurrently with the other sentences and to each other. The circuit court dismissed the remaining four counts on which the jury had found Nathan guilty, finding that it had no jurisdiction over these charges because they were outside the scope of the juvenile court's[2] certification under section 211.071.

Nathan appeals his convictions for first-degree murder and the related armed criminal action, and the state cross-appeals the dismissal of the four charges. The court of appeals ordered this matter transferred to this Court because Nathan argues that section 565.020 is invalid under *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). This Court has jurisdiction pursuant to Mo. Const. art. V, sec. 3, and the case is remanded for re-sentencing for first-degree murder and, if necessary, for further proceedings consistent with this opinion.

## I. Facts

Nathan challenges the sufficiency of the evidence only as it relates to the element of deliberation on the first-degree murder charge. Viewing the evidence at trial in the light most favorable to the verdict, the evidence was sufficient for the jury to find the following facts.

Shortly after midnight on October 5, 2009, Nathan and his accomplice, Mario Coleman, emerged from a vehicle and approached off-duty police officer Isabella Lovadina and Nicholas Koenig, who were standing in front of the house where Koenig's grandmother Ida Rask lived. Nathan was carrying a "silver" pistol, and Coleman was armed with a "black" pistol. Both pointed their guns at Lovadina and Koenig, ordering them to turn over their belongings. Nathan and Coleman forced the two inside the Rasks' house. At the time, Rask, her two daughters Rosemary Whitrock and Susan Koenig (Nicholas' mother), Whitrock's daughter Gina Stallis, and Stallis' two young children all were sleeping in the house. Coleman held Lovadina and Koenig at gunpoint while Nathan rounded up the remaining victims on the second floor, including Gina Stallis.

Nathan and Coleman took jewelry from the dressers and jewelry boxes, removed jewelry from the victims, and took money from purses. Both Nathan and Coleman threatened to kill several victims, including specifically Stallis and Whitrock, and emphasized these threats by pointing their guns in the victims' faces. Nathan ordered Stallis, at gunpoint, to carry a large television down from the second floor. A short time later, he ordered Stallis to go to the basement. Stallis turned on a light as she walked toward the basement, but Nathan immediately told her to turn it off. Seeing that Nathan was herding the victims into the basement (where they might be executed or assaulted further), Officer Lovadina moved toward the hallway where the basement door was located and offered to go to the basement instead of Stallis. Coleman moved to stop Lovadina, bringing the two of them—and Koenig, Stallis and Nathan—together in close proximity to

---

**2.** There is no separate "juvenile court" in St. Louis City or anywhere else in this state. What the parties (and the statutes) refer to as the "juvenile court" is the juvenile **division** of the circuit court. *See* § 211.021.1(3) ("'Juvenile court' means the juvenile division or divisions of the circuit court"). The distinction is important. However, for the sake of clarity, the usage of the parties and the definition of section 211.021.1(3) are adopted here. Accordingly, the juvenile division of the circuit court is referred to as the "juvenile court," and the court of general jurisdiction referred to in section 211.071.1 is the "circuit court."

each other in or near the hallway near the basement door.

At this point, Officer Lovadina charged Coleman in an attempt to disarm him. Nathan moved to help Coleman ward off Lovadina but was attacked by Koenig. Seven gunshots were heard during this brief fight, which ended with the shooter firing the final shots directly into Lovadina as she lay on the floor. Nathan and Coleman fled, abandoning Lovadina and Koenig, who had been hit five and three times respectively, and Stallis, who lay dead from a single gunshot wound in her chest.[3]

Coleman took Nathan to the hospital because he had been shot in the hand during the melee. There, Nathan told the x-ray technician to get rid of the red "hoodie" that Nathan had been wearing during the robbery. Nathan lied to the police about his gunshot wound, giving incomplete and contradictory answers to their questions. Outside the hospital, the police approached Coleman, who attempted to throw away the black pistol and several items of jewelry taken from the victims. The police found Nathan's silver pistol, with an empty 7–shot clip, in Coleman's car. Nathan's DNA was found on the grip of this pistol, and Officer Lovadina's blood was found spattered on the outside and inside of the barrel. All of the bullets removed from Lovadina and Stallis, and the seven shell casings found in the hallway of the home, came from this silver pistol.

## II. Trial Court Erred in Dismissing Four Counts on Grounds They Were Not Included in the Juvenile Court's Certification

■ Shortly after these crimes occurred, the juvenile officer filed a petition in St. Louis City juvenile court alleging that Nathan was a juvenile, that he had been involved in the robbery and shooting described above, and that these acts constituted first-degree murder and other crimes The juvenile officer later moved to dismiss this petition pursuant to section 211.071 and sought a determination by the juvenile court whether Nathan should be dealt with under the juvenile code or whether the juvenile court's exclusive jurisdiction over Nathan should be relinquished so that he could be charged and tried in circuit court. After a hearing, the juvenile court determined that Nathan was not a proper subject to be dealt with under the juvenile code. Accordingly, the juvenile court dismissed the petition and relinquished jurisdiction over Nathan.

The state then charged Nathan with 13 crimes (and 13 counts of armed criminal action in connection with those crimes) arising out of the home invasion, robbery and murder. Nathan moved to dismiss the four counts based on harm to Stallis (i.e., first-degree murder and first-degree robbery, with two related counts of armed criminal action) and the four counts based on harm to Whitrock (i.e., first-degree robbery and kidnapping, with two related counts of armed criminal action). Nathan argued that none of these eight charges had been "certified" by the juvenile court and, therefore, none of them could be brought or tried in circuit court. The trial court overruled Nathan's motion, but noted that it would revisit its ruling regarding the four counts involving Whitrock after the trial.

Following the jury's determination that Nathan was guilty on all 26 counts, the trial court dismissed the four counts per-

---

**3.** It appears that the number of wounds (10 counting the wound to Nathan's hand) exceeds the number of shots (7) because—in the tight confines of the dark hallway where these incidents occurred—several shots passed through one victim and struck another.

taining to Whitrock. The trial court ruled that it lacked jurisdiction over any crimes Nathan may have committed against or involving Whitrock because she was not named in Nathan's juvenile petition. The state appeals the dismissal of these counts. Conversely, Nathan appeals the trial court's failure to dismiss the four counts relating to Stallis. These claims are addressed together.

The fundamental flaw in Nathan's argument—and in the trial court's order dismissing the four counts relating to Whitrock—is that the certification procedure created in section 211.071 pertains to **individuals,** not to specific conduct, crimes or charges. The statute provides, in pertinent part:

1. If a petition alleges that a child between the ages of twelve and seventeen has committed an offense which would be considered a felony if committed by an adult, the court may . . ., in its discretion, dismiss the petition and *transfer the child* to a court of general jurisdiction for prosecution under the general law.

\* \* \*

9. When a petition has been dismissed thereby permitting a child to be prosecuted under the general law, the jurisdiction of the juvenile court *over that child* is forever terminated, except as provided in subsection 10 of this section, for an act that would be a violation of a state law or municipal ordinance.

10. If a petition has been dismissed thereby permitting a child to be prosecuted under the general law and the child is found not guilty by a court of general jurisdiction, the juvenile court shall have jurisdiction over *any later offense committed by that child* which would be considered a misdemeanor or felony if committed by an adult, subject to the certification provisions of this section.

§ 211.071 (emphasis added).

The plain language of these sections demonstrates that the focus in a certification proceeding is on the juvenile, not the conduct alleged in the petition. A petition pursuant to sections 211.031.1(3) and 211.091 serves only to invoke the juvenile court's exclusive jurisdiction by identifying the individual as being younger than 17 years old and alleging that the child has engaged in conduct that would be a crime if committed by an adult. Under the procedure set forth in section 211.071, the juvenile court may dismiss the petition and "transfer the child" to a court of general jurisdiction to be prosecuted under the general law. When that occurs, the "jurisdiction of the juvenile court over that child is forever terminated" unless the child is found not guilty in circuit court.

Nothing in the language of section 211.071 allows the juvenile court to dismiss some portions of a petition but proceed on others, and nothing allows the juvenile court to relinquish its jurisdiction over a child for some conduct but retain that jurisdiction for other conduct. If the juvenile court relinquishes its exclusive jurisdiction over a particular child, the state is not bound solely to the factual allegations raised or the violations of law asserted in the juvenile petition. Instead, the state may bring whatever charges it believes are justified, regardless of whether those charges (or the underlying facts) were included in the juvenile petition.

Accordingly, it does not matter whether the references to Stallis or Whitrock in the juvenile petition (and/or during the certification hearing pursuant to section 211.071) were explicit or implicit. The result of the juvenile court's decision to relinquish its exclusive jurisdiction over Nathan is that the state was free to bring whatever

charges it believed were appropriate based on whatever facts it believed it could prove.[4] Therefore, the trial court's decision not to dismiss the counts pertaining to Stallis was correct, but its decision to dismiss the counts pertaining to Whitrock was error. Because Nathan already has been tried and found guilty on the counts that were dismissed improperly, however, Nathan need be sentenced only on those counts on remand.

## III. Missouri Certification Proceedings are Not Unconstitutional

■ Nathan claims that section 211.071 deprived him of procedural and substantive due process and the right to trial by jury because it permitted the juvenile court to relinquish its exclusive jurisdiction based on allegations about Nathan in the juvenile petition that never were found to be true by a jury. This claim is based on the same fundamental mischaracterization of the certification process discussed above.

The certification process in section 211.071 pertains to the juvenile, not the allegations in the petition. The juvenile court is not required to find that these allegations are true, nor does it "assume" they are true. Even though the juvenile court may consider the allegations in the petition in deciding whether to relinquish its jurisdiction, section 211.071.6 refers solely to the nature of the offenses alleged, not whether the juvenile did (or did not) commit them.

If the juvenile court relinquishes its exclusive jurisdiction over a juvenile pursuant to section 211.071, the state cannot punish the juvenile unless the indictment or information gives adequate notice of the charges being asserted **and** the state proves every element of those charges to a jury beyond a reasonable doubt. Accordingly, the only things to which Nathan was "exposed" as a result of the juvenile court's certification are the very things he claims he is entitled to under due process and the Sixth Amendment, i.e., notice of the charges against him and a jury trial to determine his guilt.

■ Certification proceedings do not have to "conform with all of the requirements of a criminal trial or even of the usual administrative hearing" as long as they "measure up to the essentials of due process and fair treatment." *Kent v. United States*, 383 U.S. 541, 557–62, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The process is constitutional if a hearing is provided, the juvenile is given the right to counsel and access to his or her records, and it results in a decision that sets forth the basis for the decision to relinquish jurisdiction in a way that is sufficient to permit meaningful appellate review. *Id.*

As discussed above, the core of Nathan's argument is his contention that the juvenile court should not be allowed to relinquish its exclusive jurisdiction unless a jury first finds beyond a reasonable doubt

---

4. The breadth of the juvenile court petition and the matters proved in the certification hearing are not without meaning, however. If Nathan had moved to dismiss the charges on the ground that the juvenile court lacked a sufficient basis for dismissing the petition and relinquishing its exclusive jurisdiction over him, a denial of that motion would be reviewed solely in light of the allegations in the petition and the evidence at the certification hearing. Assuming *arguendo* that neither

contained any reference to these two victims or Nathan's crimes against them, those facts and charges could not be considered even though they later were included in Nathan's indictment and proved at trial. Nathan raises no such challenge, however, and his argument that jurisdiction over him can be divvied up between the juvenile court and the circuit court—echoes of which also resound in the following point—is denied root and branch.

that the juvenile actually committed the conduct alleged in the petition. No court has found that this is required by the Constitution, *see Breed v. Jones*, 421 U.S. 519, 537–38, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (rejecting argument to establish "criteria for, or the nature and quantum of evidence that must support, a decision to transfer"), and this Court declines to impose such a requirement here. Were the Court to do so, it would result in precisely the type of adjudication that *Breed* holds cannot be allowed in a certification proceeding without violating the juvenile's right to be free of double jeopardy. *Id.* at 531, 538 n. 18, 95 S.Ct. 1779.

Not only do the Due Process and Double Jeopardy Clauses not mandate this sort of Catch–22, Nathan's claim also lacks any basis in the text of the Missouri statutes. In reviewing a prior version of section 211.071, this Court held that Missouri's certification process is constitutional under *Kent* and does not require detailed findings of fact. *Coney v. State*, 491 S.W.2d 501, 512 (Mo.1973). Subsequent amendments to the statute have not changed this.

Nathan focuses on the requirement in section 211.071.7(4) requiring the juvenile court to make "[f]indings showing the reasons underlying the court's decision to transfer jurisdiction." Not only does this provision not purport to require that the juvenile court make findings whether the allegations in the petition actually occurred, it does not mention the allegations in the petition at all. At most, section 211.071.7(4) requires the juvenile court to make a finding as to whether one of the reasons for its decision to relinquish exclusive jurisdiction over the juvenile is the

nature of the charges alleged in the petition under section 211.071.6(1) to (4).

Nathan does not claim that the court erred in dismissing the juvenile officer's petition and relinquishing its exclusive jurisdiction over him, nor does he claim that the trial court's findings were not adequate to permit meaningful appellate review of that decision. Instead, Nathan claims that he has a constitutional right to have a jury decide whether he committed the acts alleged in the petition before the juvenile court can decide whether to relinquish its jurisdiction over him in the first instance. Nothing in section 211.071 suggests such a requirement, and Nathan provides no persuasive authority for the proposition that the Constitution imposes such a requirement. Accordingly, this claim is denied.

■ Nathan also claims that section 211.071 violates *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because it exposed him to a greater penalty under the general law than he would have received if the juvenile court had not relinquished its exclusive jurisdiction over him without requiring a jury to find the facts on which this increased exposure was based. *Apprendi* held that a jury must find any "fact that, if found, exposes the criminal defendant to a penalty exceeding that maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi*, 530 U.S. at 482, 120 S.Ct. 2348.

This claim was rejected by this Court in *State v. Andrews*, 329 S.W.3d 369 (Mo. banc 2010).[5] In a certification proceeding, the only "fact" that is found is whether the juvenile is an inappropriate subject for the juvenile code and the juvenile court's exclusive jurisdiction should be relinquished.

5. Even the dissenting opinion in *Andrews* only concluded that a jury trial was required for certification because the state argued that certification proceedings were an adequate substitute for a sentencing determination that took the juvenile's immaturity and other characteristics into account. After *Miller*, however, that argument no longer can be made.

Even after this "fact" is found, the juvenile is not "exposed" to any punishment—let alone an increased punishment—unless and until he is charged and his guilt is proved beyond a reasonable doubt. *Id.* at 376. Accordingly, this point is denied.

## IV. The State Did Not Fail to Comply with Rule 25.03(A)

■ After the jury found Nathan guilty on all counts, Nathan moved for a new trial on the ground that the state failed to disclose that Koenig, who had testified at trial, had been found guilty of violating a municipal ordinance on two occasions. The trial court rejected this claim on the ground that a municipal ordinance violation cannot be used for impeachment. The trial court also found that there was "absolutely no likelihood" that the disclosure of these municipal violations would have had any effect on the outcome of the trial.

Nathan concedes that the trial court's determination as to whether the state violated the discovery rules is reviewed only for an abuse of discretion. *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981). Even though Nathan couches his claim (in part) in terms of the Confrontation Clause, such constitutional claims do not necessarily require reversal if the error was harmless beyond a reasonable doubt. *State v. March*, 216 S.W.3d 663, 667 (Mo. banc 2007).

In his point relied on, Nathan cites Rule 25.03(A) as the only basis for his assertion that the state was obligated to disclose Koenig's two municipal ordinance violations. He claims that the state's failure to comply with Rule 25.03(A) violated numerous constitutional rights, but he does not claim that this disclosure was compelled for any reason other than Rule 25.03(A). Rule 25.03(A) requires the state to disclose "any record of prior criminal convictions" of persons the state expects to call to testify in a criminal trial. *See also* § 491.050. However, Rule 25.03 (and section 491.050) applies only to criminal convictions, i.e., convictions of misdemeanors or felonies, not violations of municipal ordinances. Conceding as much, Nathan argues that the fact that Koenig committed prior violations of municipal ordinances nevertheless could have been used to impeach her credibility. In shifting the ground of his argument, however, Nathan cast himself adrift from the only error he preserved.

Nathan does not claim that he tried to impeach Koenig with prior municipal violations and was prevented from doing so. Neither does he claim that he is entitled to a new trial so that he can make use of this "newly discovered" impeachment evidence. Instead, the only claim Nathan raises in his point relied on is that he was entitled to a new trial because the state violated Rule 25.03(A) by failing to disclose this evidence. But, as held above, the state had no obligation to disclose Koenig's municipal ordinance violations under Rule 25.03(A). Therefore, even if these violations could have been used to impeach Koenig at trial, the state was under no obligation to disclose them. Accordingly, the state's failure to disclose these prior violations did not violate Rule 25.03 and provides no basis for a new trial.

■ In addition, the trial court found that Nathan suffered no prejudice from the state's failure to disclose these municipal ordinance violations because Nathan could not have used them to impeach Koenig in any event. This finding was not an abuse of discretion. *See State v. Winfrey*, 337 S.W.3d 1, 10 (Mo. banc 2011) (use of collateral matters offered only to impeach witness's veracity is subject to the trial court's discretion in limiting or excluding such evidence when its probative value is outweighed by its prejudicial effect). Col-

lateral impeachment evidence is looked upon with disfavor and "should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity[.]" *State v. Couch*, 256 S.W.3d 64, 68 (Mo. banc 2008).

Nathan claims that Koenig's prior violations would have a "high tendency" to impeach the witness's "character for truth and veracity." This is not persuasive. The mere fact that a witness has taken items from a grocery store without paying—when such conduct was not charged as or proven to be a crime—sheds little light on the witness's reputation for truth or veracity, and perhaps no light at all. Therefore, the trial court's conclusion rejecting this argument was not an abuse of discretion. Because Nathan could not have used the municipal violations to impeach Koenig, the trial court was correct in finding that—even if the state had disclosed them—such disclosure would have had "absolutely no likelihood" of changing the outcome of Nathan's trial.

## V. Trial Court Did Not Err in Failing to Disclose Document Reviewed *In Camera*

■ In apparent concern for Nathan's discovery rights, the state submitted a sealed memorandum to the trial court before trial. This memorandum described a "law enforcement contact" involving victim Koenig that occurred after the incident for which Nathan was charged. Nathan's trial counsel was not provided a copy of this memorandum or any detailed explanation of its contents. The trial court conducted an *in camera* review of the memorandum and determined that the facts set forth in it: (a) were "definitely not exculpatory," and (b) could not even be used to impeach Koenig at trial. Therefore, the trial court ruled that the information did not have to be disclosed to Nathan. Nathan's appel-

late counsel claims to have seen the document, but failed to include it (even under seal) as part of the record on appeal.

The claim asserted in Nathan's point relied on is that the court abused its discretion in refusing to disclose the information in the memorandum. However, Nathan does not explain why he was entitled to this information or, more to the point, why the court (or the state) had any obligation to disclose it. Of the three principal participants in this appeal (i.e., this Court, the assistant attorney general, and Nathan's appellate counsel), Nathan's appellate counsel is the only one who claims to have seen this document. Yet she does not maintain that it contains exculpatory or impeachment evidence such that disclosure would be mandatory under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Nor does Nathan's appellate counsel claim that it refers to a prior conviction of the type that the state was obligated to disclose under Rule 25.03(A) or any of Nathan's other pre-trial discovery requests.

■ Instead, Nathan claims that information should have been disclosed because it *"may be* relevant to Koenig's credibility as a witness." [Emphasis added.] That is not sufficient. A "defendant is not entitled to information on the *mere possibility* that it might be helpful, but must make 'some plausible showing' how the information would have been material and favorable." *State v. Taylor,* 134 S.W.3d 21, 26 (Mo. banc 2004) (emphasis added and quotation marks omitted).

In *Taylor,* this Court held that the defendant's assertion that "the records in dispute *might* have had a bearing on [the witness's] competency to testify . . . is insufficient to have rendered the trial court's decision to deny discovery . . . of these records as being an abuse of discretion." *Id.* at 26–27 (emphasis in original). Na-

than presents no basis for a different conclusion here. Therefore, Nathan failed to establish that the state had any obligation to disclose the information provided to the trial court for *in camera* review. Accordingly, this point is denied.

## VI. Evidence was Sufficient to Find Prior Deliberation

 Nathan claims that the evidence at trial was not sufficient to prove first-degree murder because there was no basis for the jury to find that, after deliberation or "cool reflection," he aided or encouraged Coleman in causing the death of Gina Stallis. Because Stallis' death was accidental, and because the bullet that killed her may even have passed through another victim (or Nathan) before striking her, Nathan contends that he could not have deliberated on aiding or encouraging Coleman in causing Stallis' death.

Nathan's argument relies on an oversimplified version of the evidence, which he views from the most forgiving angle. This Court, however, must view the evidence in the light most favorable to the jury's finding of guilt. *State v. O'Brien,* 857 S.W.2d 212, 215–16 (Mo. banc 1993). More importantly, Nathan's argument demands a much greater degree of precision from the state's proof than the law requires.

Life is not a movie, complete with slow-motion replays from multiple camera angles, and the state is not required to prove with precision every action that occurred throughout Nathan and Coleman's prolonged robbery and home invasion. In particular, the state was not obligated to prove who fired every shot—at whom and for what purpose—during the short, one-sided gunfight that finally erupted.

Instead, the jury was instructed that it could find Nathan guilty of first-degree murder as follows:

### Instruction No. 5

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that ... the defendant **Ledale Nathan or Mario Coleman** caused the death of Gina Stallis by shooting at Isabella Lovadina or Nicholas Koenig or Gina Stallis and hitting Gina Stallis, and

Second, that defendant **Ledale Nathan or Mario Coleman** knew or was aware that his conduct was causing or was practically certain to cause the death of Isabella Lovadina or Nicholas Koenig or Gina Stallis, and

Third, that defendant **Ledale Nathan or Mario Coleman** did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Gina Stallis, the defendant **Ledale Nathan aided or encouraged Mario Coleman** in causing the death of Gina Stallis and did so after deliberation, which means cool reflection upon the matter

for any length of time no matter how brief.

[Emphasis added.]

Nathan does not challenge this instruction (other than the final paragraph, which is discussed in the next section). Instead, Nathan claims that the evidence was not sufficient for the jury to find the element of deliberation beyond a reasonable doubt as set forth in the third and fourth paragraphs above.

Whether Nathan admits or denies that he was the shooter—and his trial and appellate counsel now have done **both** [6]—the evidence was sufficient for the jury to find him guilty of deliberation under the instruction set forth above. If the jury believed Nathan fired the shot that killed Stallis, the evidence was sufficient to find that Nathan acted after deliberation to aid or encourage Coleman in doing so. If the jury believed Coleman fired that shot, the evidence nevertheless was sufficient to find that Nathan, after deliberation, was coming to aid or encourage Coleman in doing so.

As noted above, Nathan and Coleman attacked Lovadina and Koenig outside the house and forced them inside at gunpoint. Nathan moved throughout the home, using his gun to collect the victims and direct their movements. Nathan was seen and heard threatening to kill individual victims, including Gina Stallis and Ida Rask. Coleman made similar threats. Finally, Nathan began herding the victims toward the basement. Perhaps thinking that things could go from very bad to even worse if the victims were all trapped in the basement, Officer Lovadina tried to overpower Coleman.

There was conflicting evidence as to who was where in the darkened hallway when Officer Lovadina decided to fight back, and it is not clear who fired which bullets at which victims. Nathan cannot profit from this confusion, however, because the first three paragraphs of Instruction No. 5 make it clear that **it does not matter** who fired the shots, as long as the jury believed beyond a reasonable doubt that Nathan **or** Coleman did so.

There was sufficient evidence for the jury to find that Coleman fired the shots to ward off Lovadina and protect Nathan, who had been attacked by Koenig while coming to Coleman's aid. At least one witness testified that it was Coleman who shot Lovadina after she lay on the floor. On the other hand, the evidence was sufficient for the jury to conclude that Nathan was the shooter. All seven shots were fired from the silver gun that Nathan was holding when the robbery started, and Nathan's DNA was found on the butt of this pistol. Either way, the evidence was sufficient for the jury to find beyond a reasonable doubt that the facts described in the first paragraph of the verdict director were true.

Nathan does not dispute that the evidence was sufficient for the jury to find beyond a reasonable doubt the facts described in the second paragraph. Koenig was shot three times, and Officer Lovadina

**6.** At trial, the state argued that Coleman fired the shot that killed Stallis. During the opening statement, however, Nathan's trial counsel stated that Nathan would testify he fired all seven shots, including the shot that killed Stallis. Because Nathan ended up not testifying, however, Nathan's appellate counsel argues that this admission cannot be used against Nathan and criticizes the state for referring to it. Without addressing whether or for what purposes Nathan is bound by his counsel's admission, there was sufficient evidence—separate and apart from this admission—from which the jury could have found that Nathan fired at least some of the shots in that darkened hallway and that he, not Coleman, fired the shot that killed Stallis.

was shot five times (with the last shots coming after she was down and the shooter was standing directly over her). That the shooter knew death would result (or was practically certain) is proved by: (1) the number of shots and the areas of the victims' body that were hit, and (2) the fact that so many shots were fired in such a confined space filled with so many potential victims.

Once the jury concluded beyond a reasonable doubt that the shooter fired the shots that killed Gina Stallis, knowing that her death (or the death of Officer Lovadina or Nicholas Koenig) would result or was substantially certain to result, the third paragraph required that the jury find the shooter did so after deliberation. Nathan and Coleman both brought guns to help them control and coerce the victims during the robbery. The prominent use and display of these weapons was a clear (albeit non-verbal) threat that both Nathan and Coleman would kill the victims if they did not cooperate, and both men made such threats verbally as well. The shooter shot Lovadina and Koenig multiple times, and they were the only ones actively fighting against Nathan and Coleman in the darkened hallway. Finally, Nathan and Coleman both fled the scene as soon as the gunfire ended, without stopping to tend to the three grievously wounded victims. Accordingly, the evidence of the shooter's deliberation is not merely sufficient to support a finding of deliberation, it is overwhelming.

Finally, the fourth paragraph required the jury to find beyond a reasonable doubt not only that the shooter (whether Nathan or Coleman) acted after deliberation, but also that Nathan also deliberated before acting to aid or encourage Coleman in causing Stallis' death.[7] Because Coleman was reacting to Officer Lovadina's attack, Nathan claims that it was impossible for the jury to find that he (Nathan) had time to "consciously and calmly countenance Coleman's decision to shoot in the seconds it took for the gun to fire." Nathan ignores the first three paragraphs of the instruction, which allow the jury to find that **either** Coleman or Nathan was the shooter. If the jury believed Nathan was the shooter (which the evidence supports), the evidence that Nathan acted after deliberation clearly was sufficient, as discussed above.

If the jury believed that Coleman was the **shooter** (which the evidence also supports), the evidence was sufficient for the jury to find that **Nathan** acted with deliberation when he came to Coleman's aid as Coleman was firing the shots that caused Stallis' death. When Officer Lovadina attacked Coleman, there is no question that Nathan moved to help him. This evidence is sufficient for the jury to find that Nathan—after deliberation—aided or encouraged Coleman in causing Stallis' death.

■■■ Deliberation is not a question of time—an instant is sufficient—and the reference to "cool reflection" does not require that the defendant be detached or disinterested. Instead, the element of deliberation serves to ensure that the jury believes the defendant acted deliberately, consciously and not reflexively. Here, Nathan and Coleman acted throughout their crime-filled evening as a team, a single unit. They worked together to control the victims and, by doing so, to control the

---

7. Nathan claims in a separate point that this fourth paragraph is unconstitutionally vague because it does not specify which acts Nathan is required to have deliberated upon before performing them. As discussed in the following section, the fourth paragraph is clear on this point. The act referred to is the act just described, i.e., that Nathan aided or encouraged Coleman in causing the death of Gina Stallis.

situation. That is why, when Officer Lovadina attacked Coleman and Koenig attacked Nathan, it does not matter whether Coleman or Nathan fired the shots. Both Nathan and Coleman were acting to restore control over the victims, and their actions resulted in Stallis' death. Accordingly, a reasonable juror could find that Nathan's actions—whether firing the gun or only coming to help Coleman as he did so—came after adequate deliberation.

Nathan's argument focuses on his claim that neither he nor Coleman intended for Stallis to be killed. Clearly, the multiple wounds to Lovadina and Koenig—the only victims fighting back against Coleman and Nathan—was sufficient evidence for the jury to find both that the shooter intended to kill them and that the shooter acted with prior deliberation. But Nathan argues that this is insufficient because Lovadina and Koenig did not die. Nathan's argument ignores the doctrine of transferred intent.

■ If, after deliberation, a defendant intends to kill victim X and kills victim Y instead, the doctrine of transferred intent provides that the defendant is guilty of first-degree murder notwithstanding the mistake. The defendant cannot escape the liability that would have attached had things gone as planned simply because the defendant killed someone other than the intended victim. This doctrine has been recognized in Missouri for more than a century, and there is no question but that it operates to "transfer" both the defendant's deliberation and his intent. *See, e.g., State v. Solan,* 207 S.W. 782 (Mo.1918) (because defendant "shot into the crowd" intending to kill Bryden, it "was not only intentional and premeditated killing, but a cool state of blood and deliberation … [and the] fact that defendant shot at Bryden and killed Threlkeld would not change the character of the offense"). *See also*

*Commonwealth v. Taylor,* 463 Mass. 857, 979 N.E.2d 722 (2012) ("principle of transferred intent applies to the element of premeditation [such as] where defendant decides after premeditation to kill one person and kills another person"). *Cf.* § 565.003.1 ("culpable mental state necessary for a homicide offense may be found to exist if the only difference between what actually occurred and what was the object of the offender's state of mind is that a different person or persons were killed").

Nathan argues that the doctrine of transferred intent should not apply to deliberation. Instead, Nathan cites *State v. Clemons,* 946 S.W.2d 206, 216 (Mo. banc 1997), for the proposition that, "[w]hile the act of homicide may be imputed to an accomplice, the element of deliberation may not be imputed by association." Nathan's argument fails because it confuses the doctrine of transferred intent with the theory of accomplice liability.

To be sure, as *Clemons* holds, Nathan cannot be guilty of first-degree murder solely because Coleman—his accomplice—acted after deliberation. But that is not what the jury found in this case, as the instruction plainly demonstrates. As discussed above, the evidence was sufficient for the jury to find both that the **shooter** acted after deliberation and that **Nathan** (whether he fired the shots or not) acted after deliberation when he rushed to aid or encourage Coleman in the acts that caused Stallis' death.

Nathan's coming to Coleman's aid when Officer Lovadina attacked was not the only evidence to support Nathan's premeditation. This Court has affirmed the findings of separate deliberation in many cases in which the defendant was convicted as an accomplice. This issue was examined in depth in *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994), in which this Court identified at least three circumstances in which

the defendant's own deliberation could be inferred even though it was the defendant's accomplice who killed the victim. The first circumstance is "where there is a statement or conduct by the defendant or a statement or conduct by a codefendant in the presence of defendant prior to the murder indicating a purpose to kill a human." *Id.* at 376 (*citing State v. Isa*, 850 S.W.2d 876, 882–83 (Mo. banc 1993) (defendant continued to aid and encourage husband after he told victim: "Tonight, you're going to die")). Both Nathan and Coleman told multiple victims they would be killed if they did not do as they were told, and Nathan continued to aid and encourage Coleman after such murderous warnings.

*Gray* found that the second circumstance in which an accomplice's deliberation may be inferred is when "the murder was committed by means of a deadly weapon and the accomplice was aware that the deadly weapon was to be used in the commission of a crime." *Gray*, 887 S.W.2d at 377 (*citing State v. Turner*, 623 S.W.2d 4, 6–7 (Mo. banc 1981) (defendant knew robbery accomplice had a gun and a knife and watched accomplice beat and stab the victim)). Here, Nathan and Coleman both had loaded pistols and even may have exchanged weapons during the robbery.

Finally, *Gray* recognizes "the third factual circumstance common in first-degree murder cases where accomplice deliberation is found to exist is where there is evidence that the accessory either participated in the homicide or continued in the criminal enterprise when it was apparent that a victim was to be killed." *Id.* at 377 (*citing State v. Lindsey*, 507 S.W.2d 1, 2 (Mo. banc 1974) (defendant continued with robbery after accomplice returned with baseball bat and said he was ready to kill one of the victims)). Nathan continued to aid Coleman even though he knew they were both armed and both had threatened to kill the victims if they did not do as they were told.

All three of the circumstances identified in *Gray* are present in this case. *See Gray*, 887 S.W.2d at 377 ("there were threats to kill made either by the defendant or in the defendant's presence[;] . . . the defendant at one point stated he would shoot [one of the victims;] . . . [and, after] the threats, he held [one of the victims] at bay while the rapes were committed"). Nathan knew that both he and Coleman were armed and already had threatened to kill several victims, yet he charged to Coleman's aid the instant Lovadina rebelled. Nathan aided Coleman either by firing the shots or by struggling with Koenig while Coleman fired them. Under either scenario, the evidence was sufficient to find that Nathan acted after deliberation. Nathan knew one of the victims (or all of them) would die or that death was substantially certain to occur. As long as the evidence was sufficient to find that Nathan's deliberations included the death of one of these victims, the doctrine of transferred intent provides that such premeditation is sufficient even though a different death resulted. Accordingly, Nathan's challenge to the sufficiency of the evidence is denied.

## VII. Premeditation Instruction was not Plain Error

■ Nathan claims that Instruction No. 5, above, was unconstitutionally "vague, confusing, internally inconsistent, and misleading." Nathan argues that this verdict director was defective because—after requiring the jury to find that Nathan acted after "cool reflection upon the matter"—the instruction fails to specify the "matter" to which it refers. Nathan concedes that this objection was not raised at trial. Therefore, this claim may be

reviewed only for plain error, assuming it merits review at all.

Under Rule 30.20, an "unpreserved claim of error can be reviewed only for plain error, which requires a finding of manifest injustice or a miscarriage of justice resulting from the trial court's error." *State v. Celis–Garcia*, 344 S.W.3d 150, 154 (Mo. banc 2011). The plain language of Rule 30.20 demonstrates that not every allegation of plain error is entitled to review. Not only must there be "manifest injustice" but, because Nathan's claim is based on instructional error, Nathan also must "demonstrate that the trial court so misdirected or failed to instruct the jury that *it is evident that the instructional error affected the jury's verdict.*" *State v. Baker*, 103 S.W.3d 711, 723 (Mo. banc 2003) (emphasis added).

The focus of Nathan's claim of instructional plain error is that the jury was instructed that, to find Nathan guilty of first-degree murder, it must find:

> Fourth, that with the purpose of promoting or furthering the death of Gina Stallis, the defendant Ledale Nathan aided or encouraged Mario Coleman in causing the death of Gina Stallis and *did so* after deliberation, which means cool reflection *upon the matter* for any length of time no matter how brief.

[Emphasis added.]

Nathan claims that the "matter" referred to in the last phrase is ambiguous and, as a result, the instruction gave the jury a "roving commission" to decide for itself the "matter" on which prior deliberation was required. This claim is based solely on speculation, however, and it is refuted by the plain language of the instruction itself.

The instruction requires the jury to find that Nathan "did so after deliberation." [Emphasis added.] The referent of the word "so" is—and only can be—Nathan's acts that "aided or encouraged Mario Coleman in causing the death of Gina Stallis." Both the language and the context are clear, and this clarity is not lost simply because of the addition of the phrase on which Nathan focuses, i.e., "which means cool reflection upon the matter[.]" This phrase merely defines the term "deliberation" which is used in the previous phrase. Therefore, the referent of the word "matter" is—and must be—the same as the referent of the word "so" in the preceding phrase, i.e., Nathan's acts that "aided or encouraged Mario Coleman in causing the death of Gina Stallis."

As discussed above, Nathan's argument stems from confusion between the doctrines of accomplice liability and transferred intent. For this reason, Nathan claims that the instruction is vague because it does not specify whether Nathan was required to deliberate regarding the death of Officer Lovadina or Koenig (whose deaths were intended or practically certain to result) or the death of Stallis (whose death Nathan claims was unintended). As discussed above, however, the doctrine of transferred intent provides that deliberation on the former will satisfy the requirement for deliberation on the latter.

Therefore, the challenged instruction was not vague or misleading. Even if the possibility of confusion was fairly debatable (and it is not), Nathan has not shown that the mere possibility of confusion makes it "**evident** that the instructional error **affected** the jury's verdict." *Baker*, 103 S.W.3d at 723. Accordingly, this point is denied.

## VIII. Nathan Must be Re-sentenced under *Miller v. Alabama*

 Nathan committed this murder when he was 16 years old. Section 565.020.2 authorizes only two punishments when a 16–year–old offender is convicted of first-degree murder: the death penalty,

and life in prison without the possibility of parole. In *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the United States Supreme Court held that the Eighth Amendment prohibits sentencing a juvenile offender to death for any crime. Here, Nathan argued that the same categorical bar should apply to life sentences without parole. The trial court overruled Nathan's motion, and, after the jury found him guilty on all counts, Nathan waived his right to jury sentencing pursuant to section 557.036.4(1). The trial court then sentenced Nathan to life without parole on the first-degree murder charge because that is the only statutorily authorized punishment for which Nathan (as a juvenile offender) is eligible.

On June 25, 2012, while Nathan's appeal was pending, the United States Supreme Court announced its decision in *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012), that the Eighth Amendment forbids sentencing a juvenile defendant to life without parole when there has been no consideration of the particular circumstances of the crime or the offender's age and development. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id. Miller* does not hold that a juvenile never can receive this sentence for first-degree murder. It holds only that life without parole may not be imposed unless the sentencer [8] is given an opportunity to consider the individual facts and circumstances that might make such a sentence unjust or disproportionate.

For the reasons set forth in *State v. Hart,* 404 S.W.3d 232, 2013 WL 3914430 (Mo.2013), decided concurrently herewith, this Court holds that Nathan's sentence of life without parole for first-degree murder violates the Eighth Amendment because it was imposed with no individualized consideration of the myriad of factors discussed in *Miller.* Therefore, Nathan must be resentenced for first-degree murder in accordance with *Miller's* requirement that the sentencer consider whether such a sentence is just and appropriate in light of Nathan's age and the other factors discussed in *Miller.* [9]

As set forth in *Hart,* if the sentencer on remand [10] is persuaded beyond a reasonable doubt that sentencing Nathan to life without parole for first-degree murder is just and appropriate under all the circum-

---

**8.** *See State v. Hart,* 404 S.W.3d 232, 2013 WL 3914430 (Mo.2013) (discussing the use of the word "sentencer" in this context).

**9.** Because *Miller* was decided while Nathan's first-degree murder conviction was on direct appeal and, therefore, not yet final, the state concedes that *Miller* is applicable to this case. This Court has not yet addressed whether *Miller* should be applied to similar cases already final before *Miller* was decided. Accordingly, nothing herein should be taken as expressing any view on that question or, if *Miller* is applicable to such cases, what relief (if any) *Miller* requires and under what circumstances.

**10.** After the jury found Nathan guilty of first-degree murder and the 25 other counts, Nathan waived his right to jury sentencing under section 557.036.4(1). The state argues that

Nathan should be bound by this waiver on remand and, as a result, the trial court-not a jury-should conduct the analysis required by *Miller.* In *Hart,* this Court rejected the state's argument to enforce the defendant's waiver of jury recommendation of sentencing on remand even though Hart had waived this right prior to the guilt phase of his trial, i.e., when it was still possible for the jury to convict him only of second-degree murder such that a sentence of life without parole would not be possible. In *Hart,* therefore, unlike in the present case, it was at least conceivable that the defendant anticipated that his waiver would have some strategic value. Even so, this Court held that Hart's waiver was not effective on remand, stating:

> [E]ven though it is reasonable to assume that Hart waived his right to jury sentencing based on which [i.e., the judge or

stances, that sentence is constitutional and must be imposed. If the state fails to persuade the sentencer on this point, however, then section 565.020—as applied to Nathan—does not provide a constitutionally permissible punishment. In that event, the trial court must set aside the jury's verdict finding Nathan guilty of first-degree murder and enter a finding that Nathan is guilty of second-degree murder.[11] Nathan then should be sentenced for second-degree murder within the statutorily authorized range of punishments for that crime.[12]

## IX. Conclusion

For the reasons set forth above, this case is remanded for Mr. Nathan to be re-sentenced for first-degree murder and, if necessary, for further proceedings consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.

All concur.

jury] he thought would be more lenient in determining the length of his sentences, it is not reasonable to assume that Hart ever considered whether he would prefer the judge or jury to make the new-and qualitatively different-decision now required by *Miller.*
*Hart,* 404 S.W.3d at 240, 2013 WL 3914430, at *6.

The same is true in this case, and it is not even as close a call as *Hart.* Here, Nathan did not waive his right to jury sentencing until **after** the jury had convicted him of first-degree murder. At that point, the only statutorily authorized punishment available for that crime was life without parole. Accordingly, this Court holds that Nathan's waiver of jury recommendation of sentencing may not be enforced on remand. Nathan may elect to waive jury sentencing, but he is not obligated to do so.

11. If, on remand, the trial court is required to vacate the jury's verdict that Nathan is guilty of first-degree murder on the ground that section 565.020 is void, the trial court also must vacate the jury's finding that Nathan is guilty of the armed criminal action charge predicated on his being found guilty of first-degree murder. The trial court then must enter a new finding that Nathan is guilty of armed criminal action in connection with his guilt on the second-degree murder charge. Nathan then will be sentenced for the new armed criminal action charge at the same time and in the same manner as he is sentenced for the new second-degree murder charge.

12. In this latter instance—but only in this instance—Nathan argues that he also should be re-sentenced on the remaining 21 non-homicide counts on which he was found guilty and sentenced below. Nathan did not appeal those convictions, however. He did not argue in the trial court that any one of the sentences for the non-homicide crimes (or the combined effect of all of those sentences) was unlawful or unconstitutional, and Nathan asserts no such claim in any of his points relied on in this Court. Because this claim was not preserved or presented, it will not be addressed. *State v. Brookshire,* 325 S.W.2d 497, 500 (Mo. banc 1959) ("questions for decision on appeal are those stated in the points relied on, and a question not there presented will be considered abandoned"); *Pruellage v. De Seaton Corp.,* 380 S.W.2d 403, 405 (Mo. banc 1964) (appellant cannot expand the issues presented for review simply by discussing issues within the body of the argument). To the extent that Nathan was attempting to assert a claim based on the combined effect of the non-homicide sentences and his sentence for the murder charge, such a claim is premature until after the re-sentencing procedure described above, and will be moot if Nathan is sentenced to life without parole.