

# Missouri Court of Appeals

## Southern District

### Division One

IN THE INTEREST OF P.J.T., )
)
SCOTT COUNTY JUVENILE OFFICER, )
)
      Petitioner-Respondent, )
)
v. )   No. SD36997
)   Filed: November 17, 2021
P.J.T. )
)
      Respondent-Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF SCOTT COUNTY

Honorable Samuel R. Barker, Special Judge

### **AFFIRMED**

P.J.T. appeals from a judgment entered by the juvenile division of the circuit court that transferred his case to a court of general jurisdiction for criminal prosecution as an adult pursuant to § 211.071.[1]  Evidence adduced at the certification hearing showed that P.J.T. stole a loaded .45 caliber handgun from his guardian and brought it to a fight between a juvenile friend and another juvenile.  After the fight was over, P.J.T. fired three shots into

---

[1]  All statutory references are to RSMo (2016).  All rule references are to Missouri Court Rules (2020).

a group of individuals. One of the bullets hit an unarmed, 15-year-old bystander (Victim), causing life-threatening injuries to him.

Presenting two points, P.J.T. contends the judgment should be reversed because he received ineffective assistance of counsel. P.J.T. argues that his counsel was ineffective because he failed to: (1) conduct a meaningful investigation; and (2) object to the admissibility of hearsay evidence. Finding no merit in either argument, we affirm.

*Factual and Procedural Background*

In November 2020, P.J.T. was 15 years old. In early November 2020, a Deputy Juvenile Officer (DJO) and counsel for the Juvenile Officer (JO Counsel), filed a petition in the juvenile division asserting that P.J.T. was in need of care and treatment, pursuant to § 211.031.1(3), because he allegedly committed offenses that would be felonies if committed by a person 17 years or older.[2] The petition alleged that on November 11, 2020, P.J.T. committed the following three felonies:

> Count 1 alleged the class A felony of assault in the first degree, in violation of § 565.050, when P.J.T. "attempted to kill or knowingly caused serious physical injury" to Victim "by shooting [him] with a firearm, to-wit: a .45 caliber handgun."

> Count 2 alleged the unclassified felony of armed criminal action, in violation of § 571.015, when P.J.T. committed the above first-degree assault "by, with or through the use … of a dangerous instrument or deadly weapon[.]"

> Count 3 alleged the class E felony of unlawful use of a weapon, in violation of § 571.030, when P.J.T. "exhibited, in the presence of one or more persons, a weapon readily capable of lethal use[.]"

The petition was filed on November 12, 2020. That same day, the juvenile division judge set a detention hearing and appointed Keith Allen (Allen) as counsel for P.J.T. Allen

---

[2] In relevant part, § 211.031.1(3) states that the juvenile division has exclusive original jurisdiction in proceedings involving "any person who is alleged to have violated a state law or municipal ordinance prior to attaining the age of seventeen years[.]" *Id*.

appeared on behalf of P.J.T. at the detention hearing. As a protection for P.J.T. and others, and because P.J.T. might flee, he was ordered to remain in detention until further order of the court. JO Counsel filed a motion for certification pursuant to § 211.071. This motion asked the court to dismiss the juvenile proceeding and permit the State to prosecute P.J.T. in a court of general jurisdiction under general law.

The allegation that P.J.T. committed first-degree assault required the court to conduct a mandatory certification hearing pursuant to § 211.071.1.[3] Section 211.071.6 requires that a written report be prepared:

> A written report shall be prepared in accordance with this chapter developing fully all available information relevant to the criteria which shall be considered by the court in determining whether the child is a proper subject to be dealt with under the provisions of this chapter and whether there are reasonable prospects of rehabilitation within the juvenile justice system. These criteria shall include but not be limited to:
>
> (1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;
>
> (2) Whether the offense alleged involved viciousness, force and violence;
>
> (3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;
>
> (4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;
>
> (5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

---

[3] Section 211.071.1 provides in relevant part that "[i]f a petition alleges that any child has committed an offense which would be considered … first degree assault under section 565.050, … the court shall order a hearing, and may in its discretion, dismiss the petition and transfer the child to a court of general jurisdiction for prosecution under the general law." § 211.071.1; *see also* Rule 129.04.

(6) The sophistication and maturity of the child as determined by consideration of his or her home and environmental situation, emotional condition and pattern of living;

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and

(10) Racial disparity in certification.

§ 211.071.6(1)-(10).

On November 18, 2020, a certification social summary (Summary) was filed. The Summary contained information relevant to each of the ten criteria to be considered for certification pursuant to § 211.071.6(1)-(10). The Summary was signed by both the DJO and the Chief Juvenile Officer, Phillip Warren (Warren). A copy was provided to Allen. The juvenile division judge set the certification hearing for December 3, 2020.

At the certification hearing, Allen appeared on behalf of P.J.T., who appeared via video. Also appearing was P.J.T.'s guardian (Guardian). The Summary was admitted without objection. JO Counsel called Warren as the only witness. According to Warren, the current charges arose from the following events. A friend of P.J.T. wanted to fight another juvenile at an apartment complex and asked P.J.T. to go with him for support. P.J.T. stole a .45 caliber pistol, fully loaded, from Guardian to take with him to the fight. There were numerous individuals where the fight took place. After the fight was over, when there was no threat of imminent harm and P.J.T. was unprovoked, he fired three shots into the crowd.

One shot struck Victim, who was unarmed and at the apartment complex to play basketball. Victim's injuries were serious and life-threatening. He was struck in the right

4

front pelvis area and required multiple surgeries to remove a significant portion of his large intestine and repair his bladder. It was uncertain whether additional surgeries would be required or what the lifelong effect of his injuries would be. After the shooting, P.J.T. got into a waiting vehicle and left the scene. He threw the handgun into a drainage ditch.

According to the Summary, once P.J.T. was in custody, he "admitted to taking the firearm from [Guardian] and discharging the firearm towards a large group (15-16 people)[.]"[4] P.J.T. did not know Victim.[5] Prior to being transported to the detention center, P.J.T. "showed no remorse for his actions, his only concern was if they were going to make him cut his hair."

P.J.T. had a history of prior interactions with the juvenile office. According to Warren, P.J.T. had a prior referral for striking a student in the head with an iPad. P.J.T. injured the student and broke the iPad in half. Based on that referral, P.J.T. was placed on informal probation through the juvenile office. P.J.T. participated in the "SORT program," which consists of mentoring, life-skills training, and an in-person anger management class. P.J.T. also completed an online, eight-hour anger management class and participated in some counseling. Prior to that referral, P.J.T. had "somewhere in the neighborhood of 28 discipline referrals [that had] to do with a lack of respect for authority, some physical altercations with other students, refusing to follow orders, disrespect, [and] a couple of fights." Warren did not believe P.J.T. had a learning disability or mental health issues that

---

[4] Prior to making this admission, P.J.T. was advised "of his rights in the presence of his legal guardian [and] understood and agreed to make a statement."

[5] With respect to firing shots at the crowd, P.J.T. told two different versions of events. In one version, P.J.T. said there was an "accidental discharge" as he pulled the gun out of his sweatshirt pocket. In the other version, P.J.T. said that "he was retreating down the hill as 10 to 15 people were coming after him and he felt threatened." The friend with whom P.J.T. went to the fight, recounted the events much differently. The friend stated that he saw P.J.T. walking toward the group with his arm extended, firing shots.

would indicate a lack of ability to comprehend the seriousness of the current charges against him.

In Warren's opinion, there was very little likelihood of any rehabilitation for P.J.T. in the juvenile system. P.J.T. had already participated in anger management and counseling services for his prior referral. Those services did nothing to rehabilitate him. The only other possible treatment would be to commit him to the Division of Youth Services (DYS), but DYS typically operates nonsecure facilities and had few secure facilities available. Warren could not guarantee a placement in a secure setting. That would create concerns about protecting the community, Victim and Victim's family. In addition, there was little likelihood of rehabilitating P.J.T. for these kinds of offenses. Warren opined that certification was really the only option for P.J.T.

After Warren's direct examination concluded, Allen conducted an extensive cross-examination. Allen also called P.J.T. to testify on his own behalf and presented a closing argument.

Thereafter, the juvenile division judge entered a judgment dismissing the juvenile proceeding and transferring P.J.T.'s case to a court of general jurisdiction for prosecution as an adult. The judge made detailed findings with respect to each of the ten criteria listed in § 211.071.6(1)-(10).[6] The judge concluded that nine of the ten criteria supported certification of P.J.T. for the following reasons:

> With [P.J.T.'s] history of aggressive, defiant, and violent behaviors, and further combined with the viciousness of the allegations currently before the Court, the Court concludes that the juvenile system is not able to effectively address these issues and rehabilitate [P.J.T.] while simultaneously keeping its commitment to keep the community safe.

---

[6] With respect to the tenth criteria, the judge found that the race of P.J.T. and Victim "had no impact" on the determination of which allegations to make against P.J.T. or the question of whether to seek certification. *See* § 211.071.6(10).

This appeal followed.

*Discussion and Decision*

"A judgment dismissing a juvenile from the juvenile division's jurisdiction is final and appealable." ***D.E.G. v. Juvenile Officer of Jackson Cty.***, 601 S.W.3d 212, 218 (Mo. banc 2020). A juvenile has a due-process right to counsel in a juvenile proceeding. ***D.C.M. v. Pemiscot Cty. Juvenile Office***, 578 S.W.3d 776, 782 (Mo. banc 2019). That right to counsel would be hollow unless counsel is required to be effective. ***Id***.

In Points 1 and 2, P.J.T. is not contending that the juvenile division judge committed an error in granting the request for certification. Instead, P.J.T. is contending that he is entitled to relief because he received ineffective assistance of counsel. Thus far, "Missouri law has not defined the standard to be applied when determining whether a juvenile's counsel was effective." ***Id***. at 784 n.11. There are two possible standards that could be used to decide this issue.

The first is the "meaningful hearing" standard, which is used in termination-of-parental-rights cases. *See **In Interest of J.P.B.***, 509 S.W.3d 84, 97 (Mo. banc 2017). Under the "meaningful hearing" standard, the issue is determined by "whether the attorney was effective in providing his client with a meaningful hearing based on the record." ***In re W.J.S.M.***, 231 S.W.3d 278, 283-84 (Mo. App. 2007); ***J.P.B.***, 509 S.W.3d at 97; *see also **In re K.A.F.***, 592 S.W.3d 382, 383-84 (Mo. App. 2019).

The second is the ***Strickland*** standard, which is used in adult criminal proceedings. ***Strickland*** requires proof that: (1) trial counsel failed to demonstrate the level of skill and diligence of a reasonably competent attorney under similar circumstances; and (2) the defendant was prejudiced by this failure. *See **Strickland v. Washington***, 466 U.S. 668, 687 (1984); ***Grado v. State***, 559 S.W.3d 888, 898 (Mo. banc 2018). Prejudice requires a

showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Strickland***, 466 U.S. at 694; ***Grado***, 559 S.W.3d at 898.

*Point 1, Failure to Investigate*

Point 1 contends P.J.T. received ineffective assistance of counsel due to Allen's failure "to conduct any meaningful investigation[.]" The following facts are relevant to this point.

As mentioned previously, Allen conducted an extensive cross-examination of Warren. As part of that cross-examination, Allen elicited the following testimony from Warren:

1. This was the first time, not the second, that P.J.T. appeared before the juvenile division, given that his prior probation was "informal."

2. P.J.T. was cooperative while on informal probation.

3. P.J.T. tested positive for marijuana on the day of the shooting.

4. P.J.T. said he felt threatened when he fired the shots.

5. P.J.T. may have been ensuring protection of his friends.

6. It was possible that P.J.T. did not intentionally shoot Victim, which would support a lesser felony charge that did not require a mandatory certification hearing.

7. DYS offers services that would benefit P.J.T.

8. P.J.T. had a "less than desirable" family life, lacking a relationship with his biological parents.

9. P.J.T. did have a suitable home with Guardian, who was supportive.

Allen then called P.J.T. to testify on his own behalf. Allen elicited the following testimony from P.J.T.:

1. He fully participated in and benefited from the online anger management course, "the SORT program [lasting] 13 or 14 weeks[,]"

8

and "[f]our to five" counseling sessions offered through the juvenile system.

2. He acknowledged making bad decisions.

3. He believed he would benefit from programs still available in the juvenile system.

4. He would fully participate in any programs offered.

Allen then gave a closing argument. He argued that P.J.T. could still benefit from DYS, particularly for treatment of his drug use, and that P.J.T. could be rehabilitated while remaining in the juvenile system.

In Point 1, P.J.T. argues that Allen failed to conduct any meaningful investigation. P.J.T. identifies the following six alleged omissions by Allen:

1. He did not know whether P.J.T. "had paid restitution while on informal probation."

2. He did not introduce evidence of P.J.T.'s troubled childhood.

3. He did not introduce "*any* other mitigating evidence."[7]

4. He did not introduce evidence of P.J.T.'s improved behavior based upon the services he received on informal probation.

5. He did not introduce evidence that Guardian was "extremely cooperative" and willing to provide any information about P.J.T.

6. He did not introduce evidence that Guardian wanted P.J.T. to receive anger management counseling.

P.J.T. argues that he was "prejudiced because troves of mitigating and impeachment evidence were available and there is a reasonable probability that [he] would not have been certified to be prosecuted as an adult but for counsel's ineffectiveness." He has requested that we remand this case for an evidentiary hearing to determine whether

---

[7] P.J.T.'s brief does not specify what such evidence was or explain how it could have affected the judge's analysis.

Allen was ineffective because the "record on counsel's ineffectiveness is incomplete[.]" We disagree.

P.J.T.'s request relies on **D.C.M.**, 578 S.W.3d 776, but that case is factually distinguishable. There, D.C.M. alleged that his counsel was ineffective for failing to call a key witness to testify as to whether D.C.M. made the threatening statement that formed the factual basis for the underlying charge. *Id*. at 783. Our Supreme Court remanded the case for an evidentiary hearing on the matter because "[w]ithout knowing this information, it cannot be determined on this record whether Counsel was ineffective." *Id*. at 784. Here, we have no such issue. P.J.T. "admitted to taking the firearm from [Guardian] and discharging the firearm towards a large group (15-16 people)[.]" Thus, unlike **D.C.M.**, the record here is sufficient to determine whether counsel was effective, particularly given the arguments presented. *See Interest of J.T.J.*, --- S.W.3d ----, 2021 WL 560351, at \*5 (Mo. App. E.D. Feb. 16, 2021).

After reviewing the entire record, we conclude that P.J.T. is not entitled to relief under either the "meaningful hearing" or **Strickland** standards.

Based on our review of the record, P.J.T. has failed to demonstate that he was deprived of a meaningful hearing. *See In Interest of N.L.W.*, 534 S.W.3d 887, 902 (Mo. App. 2017). Here, Allen conducted an extensive cross-examination of Warren at trial, during which he elicited testimony favorable to P.J.T.'s case. Allen also presented evidence on P.J.T.'s behalf, including P.J.T.'s own testimony. While P.J.T. suggests other witnesses could have been called to testify at the hearing, or that Allen could have made additional arguments regarding mitigation and cooperation, these complaints do not amount to P.J.T. being deprived of a meaningful hearing. *See id*. (counsel providing similar assistance did not deprive father of meaningful hearing); *see also K.A.F.*, 592 S.W.3d at

10

383-84 (counsel actively participated at trial to present father's side of the story; counsel not "entirely passive" as father claimed); *Interest of A.R.B.*, 586 S.W.3d 846, 863 (Mo. App. 2019) (counsel "zealously cross-examined" witnesses and called several witnesses to support mother's position; counsel provided a meaningful hearing based on the record, and his representation was not ineffective). Because P.J.T. failed to show that he was deprived of a meaningful hearing based on the record, he cannot show he received ineffective assistance under the "meaningful hearing" standard.

Similarly, P.J.T. has failed to demonstrate that Allen was ineffective under the *Strickland* standard. *Strickland*, 466 U.S. at 687; *Grado*, 559 S.W.3d at 898. As an initial matter, P.J.T. misrepresents the record as to five of the six alleged omissions by Allen. The record shows that evidence was, in fact, presented to the court through the direct and cross-examination of Warren with respect to: (1) P.J.T.'s troubled childhood; (2) his improved behavior based upon services he received on informal probation; (3) his supportive Guardian; and (4) other mitigating evidence, such as P.J.T.'s drug use and need for treatment. Much of this evidence was also detailed in the Summary. To the extent that P.J.T. is arguing that Allen was ineffective for not introducing additional evidence on these issues, he cannot be deemed ineffective for failing to present cumulative evidence. *Tisius v. State*, 519 S.W.3d 413, 427 (Mo. banc 2017).

P.J.T.'s remaining argument concerning Allen's alleged failure to know whether P.J.T. paid restitution fares no better. P.J.T. fails to demonstrate how he was prejudiced by such an alleged failure. The criteria most concerning to the juvenile division judge included: (1) P.J.T.'s history of aggressive, defiant and violent behaviors; (2) the viciousness of the current allegations; and (3) the inability of the juvenile system to effectively address these issues while keeping the community safe. Given these concerns,

11

P.J.T. cannot show a reasonable probability that, but for Allen's failure to know whether P.J.T. paid restitution – or for any or all of Allen's alleged omissions combined – the result would have been different. *Strickland*, 466 U.S. at 687; *Grado*, 559 S.W.3d at 898. By failing to meet the "but for" prejudice test of *Strickland*, P.J.T. cannot prove ineffective assistance. *See Taylor v. State*, 382 S.W.3d 78, 82 (Mo. banc 2012) (lack of sufficient showing of prejudice alone disposes of ineffectiveness claim).

Thus, because the record shows P.J.T. received a meaningful hearing and he suffered no prejudice from Allen's alleged omissions in his investigation, P.J.T. received effective assistance of counsel from Allen. Point 1 is denied.

*Point 2, Failure to Object to Hearsay*

Point 2 contends P.J.T. received ineffective assistance of counsel by Allen's failure "to object to the admissibility of hearsay evidence[.]" Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *McFadden v. State*, 619 S.W.3d 434, 447 (Mo. banc 2020). Hearsay is generally inadmissible unless the statement meets a recognized exception. *A.J.C. by and through Next Friend J.D.C. v. K.R.H.*, 602 S.W.3d 857, 864 (Mo. App. 2020). The following facts are relevant to this point.

After Warren answered a question on re-direct, Allen acknowledged that hearsay was inherent in this type of proceeding and asked the judge to give such evidence "the weight that it's due." Allen made this request after Warren responded to a question concerning whether the shooting was the result of negligence as opposed to being purposeful:

> [JO COUNSEL]: – have you received any information which would contradict the assertion that this shooting was a result of negligence as opposed to being purposeful?
>
> [WARREN]: We had received information, again, from the juvenile who is friends with [P.J.T.], that asked [P.J.T.] to go with him to the fight, who

12

states that he observed [P.J.T.] have his arm extended with the gun out in front of him and actively walking towards the group of people firing off rounds, which, to me, it shows more of an intent than it does a reckless or a negligent manner.

[JO COUNSEL]: Thank you, Judge. That's all I have.

ALLEN: Okay. Judge, if I may – if I may interrupt. I'm not intending to formally object to that testimony, because given the dynamic of our hearing and given the – this – what type of hearing it is, I don't think it would be something that the Court would necessarily object to being discussed, that – that hearsay. However, I would ask that the Court give that the weight that it's due.

THE COURT: Granted.

Later, during Allen's closing argument, Allen reminded the juvenile division judge

that the allegations in the petition had yet to be determined in a court of law:

ALLEN: Your Honor, almost entirely [JO Counsel's] closing remarks are based on facts that he's alleged that have not been determined in a court of law. We – these are – certainly, the allegation and the charge is serious and that is one of the elements, but [JO Counsel] has characterized what has happened here without our having determined that in court. Now, certainly, I'm not making light of the allegation. Certainly, a gun went off and someone was harmed, but we don't know a whole lot about this story. We know very little, actually.
….

THE COURT: Okay. You know, it's an interesting proposition that we have here today in that when we're talking about due process – and I agree with you, Mr. Allen, you know, it's – we're – in part, we're presuming that what the Juvenile Office was otherwise saying is true because we're not really litigating those specific facts.

Those facts – those facts do come in, but we're not necessarily litigating the truthfulness or veracity of them. It's more of a, well, let's just say that this occurred, and because this occurred these are the facts that surround – they are the facts that surround this and we can or can't do anything for the juvenile because of it. And you're kind of handcuffed in a – into a position in these type of hearings to just kind of take it. You know, it's – there's not a lot you can do about that.
….

What's been brought to the Court is the child had forethought to go steal – there's been no testimony today that the gun was given to him and said, yeah, here, you go take this. He stole the weapon from an individual. With

13

forethought, he went to what he knew was going to be a physical altercation, a dangerous situation anyway. The testimony was that he – he walked into a crowd with a gun pointed, specifically whether it was pointed at this individual or is that just a group of individuals, and then consciously began to pull the trigger striking another person.

That's a degree of viciousness that I think – I don't know that there's a whole lot that the – that the juvenile system is going to be able to address within such a short period of time. He's 15 years of age going on 16. And it's unfortunate. It's highly unfortunate. If I had a – if I had a wand that I could wave to help you take this all back, [P.J.T.], I would certainly wave that wand. But the fact of the matter is I don't. And I – and I wish there was – there was probably more within the juvenile – within facilities or there was counseling involved that we could maybe address this type of act, but the reality is I don't think that there is.

And so, with that being said, I'm going to order that these charges are hereby dismissed through the Juvenile Office and I'm going to order that – that you are to otherwise be released. And it's going to be up to the State as to whether or not they pursue the charges against you.

P.J.T.'s point argues he was prejudiced by Allen's failure to object to inadmissible hearsay evidence because "the inculpatory parts of the [Summary] and nearly all of the testimony introduced in favor of certifying [P.J.T.] to be prosecuted as an adult was inadmissible and there is a reasonable probability that [he] would not have been certified to be prosecuted as an adult but for counsel's ineffectiveness." Again, we disagree.

As an initial matter, Allen and the juvenile division judge were correct in recognizing that that the certification hearing was not an adjudication on the merits of the allegations in the petition. Rule 116.02, governing rules relating to juvenile proceedings, provides that "[a]t all hearings *involving adjudication* of the allegations of the petition or motion to modify, the rules of evidence shall apply." *Id*. (emphasis added). It is also well settled that the "certification process in section 211.071 pertains to the juvenile, not the allegations in the petition." *State v. Nathan*, 404 S.W.3d 253, 260 (Mo. banc 2013). In *Nathan*, our Supreme Court explained:

14

The juvenile court is not required to find that these allegations are true, nor does it "assume" they are true. Even though the juvenile court may consider the allegations in the petition in deciding whether to relinquish its jurisdiction, section 211.071.6 refers solely to the nature of the offenses alleged, not whether the juvenile did (or did not) commit them.

*Id*. Given that certification hearings are non-adjudicatory and unique, "the hearsay rules of evidence do not strictly apply." *Interest of T.D.S.*, --- S.W.3d ----, 2021 WL 4955508, at *6 (Mo. App. E.D. Oct. 26, 2021); *see also* *D.E.G. v. Juv. Officer of Jackson Cty.*, 601 S.W.3d 212, 229 (Mo. banc 2020) (Fischer, J., dissenting) (noting that "every federal court that has addressed the issue has held that the rules of evidence do not strictly apply in juvenile certification proceedings"); *see, e.g.*, *U.S. v. SLW*, 406 F.3d 991, 995 (8th Cir. 2005) ("we reject SLW's argument that the hearsay rule applies at juvenile transfer proceedings"); *State v. Wright*, 456 N.W.2d 661, 664 (Iowa 1990) (statute that "makes admissible all relevant and material evidence" leaves no doubt that the legislature intended admission of reliable hearsay including juvenile officer's report).[8]

Similarly, Allen and the juvenile division judge were also correct in acknowledging that hearsay was inherent in this type of proceeding. Section 211.071 instructs that at the certification hearing, the court "shall consider" a written report containing "all available information" relevant to the ten criteria for certification. § 211.071.6. "Such a report will, by necessity, contain hearsay." *T.D.S.*, --- S.W.3d ----, 2021 WL 4955508, at *5. "The plain meaning of the instruction in section 211.071 allows the court to consider hearsay evidence." *Id.*; § 211.071.6.

Further, Missouri courts allow a wider amount of latitude in the admission of evidence in a court-tried case because there is less risk the court will be misled or confused.

---

[8] For a thorough and comprehensive discussion of the issue of the admissibility of hearsay in certification proceedings, see *T.D.S.*, --- S.W.3d ----, 2021 WL 4955508, at *4-7.

*See* **State v. Sladek**, 835 S.W.2d 308, 313 (Mo. banc 1992); *see also* **In re I.R.S.**, 361 S.W.3d 444, 449 (Mo. App. 2012) (it is "nearly impossible in a court-tried case to predicate reversal on the erroneous admission of evidence. Deference is given to the judge's ability to consider that evidence which is relevant and admissible"); **State v. Elliott**, 271 S.W.3d 604, 607 (Mo. App. 2007) (presumption exists that the judge in a court-tried case "was not confused or misled by any allegedly irrelevant or inadmissible evidence unless the record clearly demonstrates that the trial court considered and relied upon the inadmissible evidence"). This Court recognizes that the circuit court is "perfectly capable of receiving some evidence for one purpose and not another" and presumes the circuit court "was not prejudiced by any inadmissible evidence and was not influenced by such evidence in reaching [its] decision." **I.R.S.**, 361 S.W.3d at 449 (internal quotations and citations omitted). The record indicates the juvenile division judge was cognizant of this concept in granting Allen's request to give the challenged evidence "the weight that it's due."

Thus, because the juvenile division judge was allowed to consider hearsay evidence in the certification proceeding, Allen did not provide ineffective assistance by failing to object to hearsay evidence. "The failure to make meritless objections does not constitute ineffective assistance of counsel." **Tisius**, 519 S.W.3d at 429; **McFadden v. State**, 553 S.W.3d 289, 317 (Mo. banc 2018). For the same reasons as stated in Point 1, P.J.T. received a meaningful hearing on the record. Because P.J.T. failed to show he received ineffective assistance for Allen's alleged failure to object to hearsay under either the "meaningful hearing" standard or the **Strickland** standard, Point 2 is denied.

The judgment certifying P.J.T. to be tried as an adult is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

WILLIAM W. FRANCIS, JR., P.J. – CONCUR

JACK A. L. GOODMAN, J. – CONCUR